# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Ray Fellows,                                    Case No. 3:09CV10015

      Plaintiff,

  v.                                          ORDER

Foster Wheeler LLC, et al.,

      Defendant,


This is an asbestos product liability case in which the defendant Foster Wheeler, LLC, filed a notice of removal in the Cuyahoga County, Ohio, Court of Common Pleas. Pending is plaintiff's motion to remand [Doc. 10], which defendant opposes. [Doc. 15].

Defendant based its notice of removal on 28 U.S.C. § 1442(a)(1), which permits removal by a defendant which contends that it conducted the acts giving rise to this lawsuit at the direction of a person acting under the authority of an officer of the United States. In his motion to remand, plaintiff contends that defendant has not sufficiently substantiated that contention, and thus is not entitled to removal.

Defendant's opposition provides ample substantiation to establish at this stage that, among other defenses, it will be asserting a colorable government contractor defense. No more is needed to overcome the motion to remand.

This is certainly so given the fact that plaintiff did not file a reply to defendant's contentions and supporting documentation.

This is, no doubt, not the first time this defendant has been sued for work allegedly done several decades ago on Navy ships, and thus, to some degree of likelihood, at government direction. Had there been any merit to plaintiff's contentions that removal under § 1442(a)(1) was not proper, some other court would have said so by now. It has not, and plaintiff has not shown any reasonable basis for doubting that defendant has a colorable government contractor defense.

While in this instance I will not call on plaintiff to show cause why it should not be assessed costs under Fed. R. Civ. P. 11, doing so might be appropriate in future instances where easily refutable challenges are made to removal by this defendant in a similar case.

For now, it suffices to say that defendant's opposition to the remand motion shows more than adequate grounds for keeping this case in this court. For the reasons stated therein and in this order, it is

ORDERED THAT:

1. Plaintiff's motion to remand [Doc. 10] be, and the same hereby is overruled;

2. The Clerk shall reassign this case by random draw to the docket of a District Judge in this Court's Eastern Division.

So ordered.

/s/ James G. Carr<br>Chief Judge

*Case reassigned to Judge James S. Gwin.*

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
MICHAEL CURRY,                                                 :

                                        Plaintiff,            :
                                                              :        MEMORANDUM DECISION
                        - against -                           :        AND ORDER
                                                              :        08-CV-10228 (GBD)
AMERICAN STANDARD, INC., ET AL.,                              :

                                        Defendants.           :
-------------------------------------------------------------- x

GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE:

Plaintiff filed this action in the Supreme Court of the State of New York. Defendant Foster Wheeler subsequently removed the case on the basis of a federal officer defense asserted under 28 U.S.C. § 1442(a)(1) (2006). Plaintiff moves to remand this proceeding back to New York State court. Plaintiff's motion is denied.

On October 8, 2008 plaintiff commenced this action against defendant Foster Wheeler and approximately twenty other defendants, alleging that plaintiff was exposed to asbestos-containing products while he served in the United States Navy. Plaintiff maintains that he developed asbestos-related mesothelioma and that his illness was caused by exposure to marine steam generators on the U.S.S. Kitty Hawk from 1963-1965. Plaintiff maintains that "[h]e was exposed to asbestos while he worked on asbestos-containing Foster Wheeler boilers." Pl. Memo. at 1. Plaintiff's only asserted claim against Foster Wheeler is for defendant's alleged failure to warn him about asbestos hazards.

Defendant Foster Wheeler received service of the complaint on or about October 31, 2008 and filed a timely notice of removal on November 24, 2008. Foster Wheeler based its removal on the asserted federal defense that, during the time period relevant to plaintiff's claims, it acted under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1),[1]

Under the federal officer removal statute, a civil action commenced in a state court against "The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may be removed by that defendant to the appropriate district court. 28 U.S.C. 1442(a)(1); see also Willingham v. Morgan, 395 U.S. 402, 406, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969) ("[T]he right of removal ... is made absolute whenever a suit in a state court is for any act 'under color' of federal office"). Removal under the federal officer removal statute "must be predicated upon averment of a federal defense." Mesa v. California, 489 U.S. 121, 109, 103 L.Ed.2d 99 (1989).

In order for a defendant to qualify for removal under 28 U.S.C. § 1442(a)(1), it must establish by a preponderance of the evidence that: 1) it is a "person" who assisted, helped or carried out duties and tasks of a federal superior, thus "acting under" a federal agent; 2) plaintiff's claims relate directly to acts defendant committed under color of federal authority; and 3) defendant has a colorable federal defense to such claims. See Isaacson v. Dow Chemical Co.,

---

[1] Defendant also filed a petition pursuant to 28 U.S.C. § 1407 to transfer this matter to the multidistrict litigation proceeding entitled In re: Asbestos Products Liability currently pending in the U.S. District Court for the Eastern District of Pennsylvania. The Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order on January 9, 2009.

517 F.3d 129 (2d Cir. 2008); United. Food & Comm. Workers Union, Local 919, AFL-CIO v. Centermark Prop. Meriden Sq., Inc., 30 F.3d 298, 305 (2d Cir. 1994) ("party asserting jurisdiction must support [challenged jurisdictional] facts with competent proof and justify its allegations by a preponderance of the evidence"). The federal officer removal statute should be construed broadly. See Arizona v. Manypenny, 451 U.S. 232, 242, 101 S.Ct. 1657, 1664, 68 L.Ed.2d 58 (1981). Accordingly, the defendant need not present "a clearly sustainable defense" in order to invoke the removal statute. Willingham, 395 U.S. at 407, 89 S.Ct. at 1816. Rather, removal will be proper if the relationship between the federal officer defendant and the plaintiff giving rise to the claims "derived solely from [defendant's] official duties." Id. at 409, 89 S.Ct. at 1817.

Defendant argues that the "government contractor defense" articulated by the Supreme Court in Boyle v. United Technologies Corporation, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) shields it from liability for plaintiff's injury. It presents evidence sufficient to demonstrate at this stage of the litigation, that it acted as an agent of the United States Navy for the purpose of producing and delivering naval equipment. Defendant "supplied boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy." See Notice of Removal at ¶ 6. Although defendant has not proven that it will prevail on its federal defense, it has proffered sufficient evidence of government control over the contract specifications, manuals, and warnings to demonstrate that it has a colorable defense.

To provide an evidentiary basis for its "government contractor defense", Foster Wheeler attached to its Notice of Removal, *inter alia*, affidavits indicating that the United States Navy maintained strict control over the products manufactured by its contractors, including Foster

-3-

Wheeler. The Inspectors of Naval Machinery exercised complete control over the equipment supplied by its contractors and "retained the 'final say' over the design of any piece of equipment." Lehman Affidavit at ¶¶4-5. Navy personnel "exercised specific direction and control over" the contents of manuals and written documentation supplied by Foster Wheeler in connection with the boilers it created. Schroppe Affidavit at ¶ 21. "These manuals included safety information related to the operation of naval boilers only to the extent directed by the Navy." Id.

Plaintiff does not dispute that Foster Wheeler acted under color of federal authority or that plaintiff's claims relate only to marine equipment defendant produced at the United States Navy's request. Rather, plaintiff argues that defendant's removal of this action is improper because "the Navy never prohibited warnings with regard to hazardous materials such as asbestos." Plaintiff's Memo. at 3-4 (emphasis in original). Plaintiff further discounts defendant's affidavits for failing to cite "any military specifications that would call for the removal of asbestos warnings from technical manuals submitted by equipment manufacturers" or any "specific instance in which a manufacturer was ever required to remove any safety warning." Id. at 5 (emphasis in original). Plaintiff maintains that defendant fails to satisfy the third prong of the Isaacson test because defendant has not proven unequivocally that the "government contractor defense" shields it from liability since it has not clearly demonstrated that it was prohibited from issuing its own warnings.

The Supreme Court has rejected plaintiff's contention that removal under 28 U.S.C. § 1442(a)(1) is only proper "when the officers ha[ve] a clearly sustainable defense," Willingham, 395 U.S. at 407, 89 S.Ct. at 1816. On the contrary, defendant must only raise a "colorable

-4-

federal defense." Isaacson, 517 F.3d at 135. In this action, defendant has demonstrated that it has sufficient facts to assert the "government contractor defense" elucidated in Boyle in an attempt to shield it from liability. The Second Circuit has made clear that the "government contractor defense" may be asserted against duty to warn claims such as those raised by plaintiff here. See In re Joint Eastern and Southern District N.Y. Asbestos Lit., 897 F.2d 626, 629 (2d Cir. 1990) ("we follow the other federal courts which already have held that Boyle may apply to a state law failure-to-warn claim"). This Court has jurisdiction over this matter since defendant has articulated a colorable federal defense sufficient to satisfy all three prongs of the Isaacson analysis.

   Plaintiff's motion to remand this action to the Supreme Court of the State of New York is DENIED.


Dated: New York, New York
      February 6, 2009

                                    SO ORDERED:

                                    _George B. Daniels_
                                    _____
                                    GEORGE B. DANIELS
                                    United States District Judge

# Exhibit D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. | | |

Present: The
Honorable      PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Karen Park | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

Attorneys Present for Plaintiffs:        Attorneys Present for Defendants:

None          None

**Proceedings:**      IN CHAMBERS - COURT ORDER

       Before the Court is a Motion to Remand filed by plaintiffs Edgardo R. Salamante and Nola Salamante ("Plaintiffs") (Docket No. 26). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for September 22, 2008, is vacated, and the matter taken off calendar.

       Plaintiffs allege claims for negligence, breach of warranty, strict liability, and loss of consortium arising out of Mr. Salamante's exposure to asbestos-containing products manufactured, fabricated, installed, or otherwise distributed by defendants. Specifically, Plaintiffs' claims that defendants violated their obligations imposed under state law to warn Mr. Salamante of the dangers associated with their asbestos-containing products. Plaintiffs allege that Mr. Salamante was exposed to the asbestos contained in defendants' products between 1957 and 1996 when he was a steward aboard various United States Navy vessels, as well as a shipwright and mechanic at the Long Beach Naval Shipyard in Long Beach, California. Plaintiffs commenced the action in Los Angeles Superior Court on June 2, 2008 and served defendant Foster Wheeler Energy Corp. ("Foster Wheeler") on June 19, 2008. Foster Wheeler removed the action to this Court on July 17, 2008. Foster Wheeler based its Notice of Removal on 28 U.S.C. § 1442(a)(1)'s federal officer removal statute. 28 U.S.C. § 1442(a) provides, in relevant part:

       A civil action or criminal prosecution commenced in a State court against
       any of the following may be removed by them to the district court of the
       United States for the district and division embracing the place wherein it is
       pending: (1) The United States or any agency thereof or any officer (or
       any person acting under that officer) of the United States or of any agency
       thereof, sued in an official or individual capacity for any act under color of
       such office . . . .

28 U.S.C. § 1442(a).

       Suits against federal officers are an exception to the general rule that a case is removable only if the federal question appears on the face of a properly pleaded complaint. See Jefferson County v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |
|---|---|---|---|

| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |

Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." Id. "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting Jefferson County, 527 U.S. at 431, 119 S. Ct. at 2075, and citing Mesa v. California, 489 U.S. 121, 124–25, 131–35, 109 S. Ct. 959, 962, 965–67, 103 L. Ed. 2d 99 (1989)).

In establishing the propriety of removal under the federal officer removal statute, the defendant need not prove a valid federal defense, only a colorable defense:

> In construing the colorable federal defense requirement, we have rejected a "narrow, grudging interpretation" of the statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." We therefore do not require the officer virtually to "win his case before he can have it removed."

Jefferson County, 527 U.S. at 431, 119 S. Ct. at 2075 (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969)). Indeed, unlike other removal statutes, which are to be interpreted strictly, "the Supreme Court has mandated a generous interpretation of the federal officer removal statute . . . ." Durham, 445 F.3d at 1252. The Supreme Court has held that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 1664, 68 L. Ed. 2d 58 (1981) (quoting Willingham, 395 U.S. at 407, 89 S. Ct. at 1816); see also Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").[1]

---

[1]    Plaintiffs argue that Foster Wheeler, a private actor, has a "special burden" in establishing the official nature of its activities, relying on Williams v. General Elec. Co., 418 F. Supp. 2d 610, 614 (M.D. Pa. 2005) (citing Freiberg v. Swinerton & Walberg Prop. Servs., Inc., 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002). Plaintiffs cite no Ninth Circuit case for this proposition. On the contrary, in Durham, discussed above, the Ninth Circuit found that a broad interpretation of the federal officer removal statute was appropriate as applied to a government contractor. See 445 F.3d at 1252. In the absence of binding authority to the contrary, the Court follows the Ninth Circuit's articulation of the appropriate interpretation of the statute. See id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  CV 08-4674 PA (JTLx)                                    Date   September 22, 2008

Title  Edgardo Salamante, et al. v. Quintec Indus., Inc., et al.

_____

In removing the action pursuant to the federal officer removal statute, Foster Wheeler claims that it is entitled to assert the "military contractor defense." The military contractor defense shields contractors from liability for state tort law for defects in military equipment supplied to the United States when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle v. United Tech. Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 2518, 101 L. Ed. 2d 442 (1988). Although originally developed in the design defect context, the military contractor defense also applies in cases where a plaintiff alleges that the government contractor breached a state law duty to warn of potential dangers. In actions alleging a failure to warn claim against a military contractor, the supplier cannot be liable when it can show: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003–04 (7th Cir. 1996); see also In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992).

Plaintiffs argue in their Motion to Remand that they have disclaimed any claim that could allow this Court to exercise jurisdiction pursuant to the federal officer removal statute. Specifically, the Complaint alleges:

> Plaintiff specifically disclaims any federal cause of action or any claim that would give rise to federal jurisdiction. To the extent that any of Plaintiff's asbestos exposure took place on a federal enclave, or to the extent that any of Plaintiff's asbestos exposure occurred on board vessels of the United States military (including Naval ships) or in the construction, maintenance and/or repair of United States military vessels and/or aircraft, Plaintiff's negligence claims against manufacturers, sellers and suppliers of asbestos-containing products installed on such vessels and/or aircraft are not based on the theory of defective design, but rather are based only on the theory of failure to warn. Since there is no evidence that the United States Government, or any of its military branches, specifically instructed manufacturers from which it purchased asbestos-containing products not to warn about the health hazards associated with exposure to asbestos, there can be no valid claim to federal jurisdiction pursuant to federal enclave, federal officer or federal contractor provisions of the United States Code. This disclaimer pertains to all of plaintiffs' claims, including those of negligence and products liability, as asserted herein.

(Complaint, ¶ 4.) Despite their purported disclaimer, Plaintiffs specifically seek damages from defendants for exposure to asbestos Mr. Salamante may have come in contact with while he served on

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |

| | |
|---|---|
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |

various United States Navy vessels, as well as at the Long Beach Naval Shipyard. First, because removals pursuant to the federal officer removal statute are premised on the existence of a federal defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs' disclaimer nor its characterization of their claims are determinative. See Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007) ("[Plaintiff's] argument that the suit must be remanded because his complaint disclaimed any federal claims is unavailing . . . . Subject matter jurisdiction under § 1442(a)(1) is based upon a federal defense, regardless of whether the plaintiff's cause of action rests on state law. . . . [O]nce [Defendant] meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction."); Ballenger v. Agco Corp., No. C 06-2271 CW, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (denying motion to remand despite complaint's disclaimer of "any claim arising from any act or omission of the United States, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States"). Moreover, Plaintiffs' disclaimer is based on an alleged lack of evidence by the defendants that the government prevented the defendants from providing warnings regarding asbestos-related health hazards. To the extent that Foster Wheeler does have such evidence, Plaintiffs' disclaimer is ineffective for this reason as well.

In their Motion to Remand, Plaintiffs state that their "complaint contains causes of action limited to state-based failure to warn claims." (Motion to Remand, p. 7, ll. 27–28.) Plaintiffs argue that Foster Wheeler has not met its burden to establish the existence of a valid federal defense to Plaintiffs' claims. Specifically, while conceding that Foster Wheeler is a "person" within the meaning of § 1442(a)(1), Plaintiffs contend that Foster Wheeler has not demonstrated that it can assert either a "causal nexus" between its actions taken at the direction of a federal officer and Plaintiffs' claims or a "colorable federal defense" based on military contractor immunity. See Durham, 445 F.3d at 1251. According to Plaintiffs, absent evidence of specific facts that Foster Wheeler was prevented from placing warnings on its products, Foster Wheeler cannot meet its burden to prove either the requisite causal nexus or the applicability of the military contractor defense. Contrary to Plaintiffs' assertions, however, Foster Wheeler's burden at this stage of the proceedings is not so exacting.

To establish their military contractor defense, defendants rely in large part on the declarations of J. Thomas Schroppe, Ben Lehman, and Lawrence Betts. Schroppe is a retired engineer who worked at Foster Wheeler from 1962 to 1999. Lehman is a retired Rear Admiral, who joined the Navy in 1942 and served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944 and as Ship Superintendent at the San Francisco Naval Shipyard from 1952 to 1954. Lehman also worked as an engineer at GE from 1946 to 1948. Betts, a physician, served in the Navy from 1972 until 2001 when he retired with the rank of Captain.

Lehman's declaration indicates that during the period during Mr. Salamante's service in the Navy, "the U.S. Navy had complete control over every aspect of every piece of equipment" used on Navy ships. (Lehman Decl., ¶ 10.) According to Lehman:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 08-4674 PA (JTLx)                    Date   September 22, 2008

Title      Edgardo Salamante, et al. v. Quintec Indus., Inc., et al.

Military specifications governed every significant characteristic of the
equipment used on U.S. Navy Ships, including instructions and warnings.
Drawings for nameplates, the texts of instruction manuals, and every other
document relating to the construction, maintenance, and operation of the
vessel was approved by the U.S. Navy. This control included the decision
of what warnings should or should not be included. Thus, the U.S. Navy
controlled the decisions with regard to instructions and warnings on every
piece of equipment. The U.S. Navy would not, and could not, permit any
equipment manufacturer or supplier to interfere with the Navy's mission
by placing warnings on any equipment [or in any instructions or manuals
with accompanied the equipment] on any U.S. Navy ships or in any
shipyards in which U.S. Navy Ships were built or repaired that might
cause Sailors or workers to deviate from their mission . . . .

In addition to specifications for the design and manufacture of the
equipment itself, the U.S. Navy also had detailed specifications that
governed the form and content of the written materials to be delivered
with the equipment, including boilers, to be supplied to the U.S. Navy. . . .
In short, the U.S. Navy dictated every aspect of the design, manufacture,
installation, overhaul, written documentation and warnings associated
with its ships and did not permit deviation from any of its contractors.

The U.S. Navy would never permit a supplier to suggest, advise, or
require any actions that would be disruptive to the normal operation of the
ship in its primary function of defending our Country. . . . Any written
material regarding procedures for working around boilers that differed
would have interfered with the normal and necessary operations of U.S.
Navy ships. Indeed, in its specifications for manuals the U.S. Navy
specifically limited warning information to items and events dealing with
the operation of equipment. By definition, the application or removal of
insulation would have been included.

. . . .

The U.S. Navy would not have allowed its equipment suppliers, such as
Foster Wheeler, to affix any warning related to asbestos hazards on their
equipment. This would have included boilers. Further, the U.S. Navy
would not have allowed Foster Wheeler to place any warnings related to
asbestos hazards in any written material provided by Foster Wheeler to the
U.S. Navy or to a U.S. Navy contractor in accordance with its contracts,
including its technical operations manuals. To do so would have

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |
|---|---|---|---|

| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |
|---|---|

interfered with the U.S. Navy's mission and control of its ships and personnel.

(Lehman Decl., ¶¶ 10–14 (first alteration in original).)  In reviewing a similar declaration submitted by Lehman, the court in <u>Nesbiet v. General Elec. Co.</u> concluded that Lehman's declaration raised "the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning." 399 F. Supp. 2d 205, 208 (S.D.N.Y. 2005).

Schroppe, who is personally familiar with the degree of supervision and control exercised by the Navy in procurement contracts with Foster Wheeler for boilers and other auxiliary equipment, stated that technical manuals accompanying naval boilers "included safety information related to the operation of naval boilers only to the extent directed by the Navy." (Schroppe Decl., ¶ 21.)

> Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy.  Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

(<u>Id.</u>, ¶ 22.)  Although the Lehman and Schroppe Declarations may not establish the absence of a triable issue of fact with respect to the first two prongs of the <u>Boyle</u> test, as modified by <u>Oliver</u> for a failure to warn claim, Foster Wheeler need not prove so much at this preliminary stage of the proceedings.  <u>See</u> <u>Oliver</u>, 96 F.3d at 1003 (applying military contractor defense when "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government . . . .").  Again, to establish the propriety of their removal, Foster Wheeler must only show a "colorable" federal defense, not a winning one.

The third prong of the military contractor defense requires the contractor to have "warned the government about dangers in the equipment's use that were known to the contractor but not to the government." <u>Id.</u> at 1004.  Defendants rely on the Betts Declaration to meet this third factor of the <u>Boyle</u> test. Through his training and experience, Betts became familiar with "the history and practice of the Navy occupational health program from its early days before World War II until the present time." (Betts Decl., ¶ 2.)  According to Betts, the "Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art.  During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a marine steam boiler on United States Navy ships known by a boiler manufacturer, like Foster Wheeler, that were not known by the United States and the United States Navy." (<u>Id.</u>, ¶ 31.)  Based upon the Betts Declaration, Foster Wheeler has provided sufficient evidence that there were no dangers known by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |
|---|---|---|---|

| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |
|---|---|

it that were not known by the government.  See Nesbiet, 399 F. Supp. 2d at 209 ("[A]ccording to Betts's affidavit, [Defendant] could not have possessed any information regarding the dangers posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.").

The Court therefore concludes that Foster Wheeler has met its burden, at this stage of the proceedings, to establish a "colorable" military contractor defense for purposes of removal under 1442(a)(1).[2]  The Court also finds that Foster Wheeler has submitted sufficient evidence of a "causal nexus" between Plaintiffs' claims and the actions Foster Wheeler took at the direction of a federal officer.  As did the court in Nesbiet, this Court finds that Foster Wheeler's evidence "is sufficient for purposes of section 1442(a) to demonstrate that the Navy's control over warnings directly interfered with [Defendant's] duty to warn under state law.  Thus, [Defendant] has satisfied the 'causal nexus' requirement." Id. at 213.

For all of the foregoing reasons, the Court finds that defendants have raised a "colorable" federal defense to the claims alleged in Plaintiffs' Complaint.  As a result, Foster Wheeler's removal pursuant to § 1442(a)(1) was proper.  Plaintiffs' Motion to Remand is therefore denied.

In its Opposition, Foster Wheeler asks that the Court stay determination of the Motion to Remand pending a decision by the Multidistrict Litigation Panel whether to transfer this case to the Eastern District of Pennsylvania as a potential "tag-along action" to MDL No. 875.  The Court notes that Foster Wheeler did not move for a stay, but rather simply asked for one in its Opposition.  Foster Wheeler argues that a stay would serve judicial economy.  The Court, however, finds that judicial economy would best be served by moving this case forward so it may be litigated in the proper forum.  Determining that federal jurisdiction exists appears to be an appropriate prerequisite to determining which federal forum is best.  The Court therefore denies Foster Wheeler's request for a stay.

IT IS SO ORDERED.

_____

[2]      The Court recognizes that when faced with arguably similar evidence, other courts have reached a different result.  See, e.g., Barrett v. CLA-VAL Co., Case No. 07-7774 PSG (FFMx) (C.D. Cal. Feb. 5, 2008); Hilbert v. McDonnell Douglas Corp., No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan. 3, 2008).  The Court declines to follow these cases because, in the Court's view, they place too high a burden on a defendant to prove its military contractor defense at such an early stage in the litigation.  Given the liberality with which removals under § 1442 are to be considered, this more exacting standard appears to conflict with Ninth Circuit precedent.  See Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WILBERT KIRKS and DENNIS KIRKS,   )
   )
       Plaintiffs,   )
   )
      v.   )  Civ. No. 08-856-SLR
   )
GENERAL ELECTRIC COMPANY, et al.,   )
   )
       Defendants.   )


LEE WIERSMA and JANICE WIERSMA,   )
   )
       Plaintiffs,   )
   )
      v.   )  Civ. No. 08-857-SLR
   )
GENERAL ELECTRIC COMPANY, et al.,   )
   )
       Defendants.   )

---

Thomas C. Crumplar, Esquire, of Jacobs & Crumplar, P.A., Wilmington, Delaware. Counsel for Plaintiffs.

Josette F. Spivak, Esquire, of Hollstein Keating Cattell Johnson & Goldstein P.C., Wilmington, Delaware.  Counsel for Defendant General Electric Company.

---

**MEMORANDUM OPINION**

Dated:  September 17, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Pending before the court are motions to remand separate but substantially identical cases. (Civ. No. 08-856, D.I. 4; Civ. No. 08-857, D.I. 4)  Both cases involve asbestos claims against a number of defendants, including General Electric Company ("GE").  In each, GE removed the case from the Superior Court of the State of Delaware to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1442(a)(1)[1] ("federal officer removal statute").  Plaintiffs[2] in both cases filed motions to remand their respective actions to State court pursuant to § 1447(c).  In its opposition to both motions to remand, GE attached the same three affidavits, which it claims support removal to federal court and will require this court to deny the motions to remand.

## II. BACKGROUND

### A. *Kirks v. Carborundum Corp.*, Civ. No. 08-856

Plaintiff Dennis Kirks brought suit on November 13, 2007 against numerous defendants on behalf of plaintiff-decedent Wilbert Kirks.  Dennis Kirks is the executor of Wilbert Kirks' estate.  (Civ. No. 08-856, D.I. 1, ex. A at ¶ 7)  Wilbert Kirks served aboard the USS Leyte between 1953 and 1957 as a boatswain's mate, and allegedly was exposed to asbestos through turbines manufactured by GE.  (*Id.*, D.I. 1, ex. A; D.I. 5, ex. A)  Wilbert Kirks died from mesothelioma on May 7, 2007.  (*Id.*, D.I. 1, ex. A at ¶¶ 5,

---

[1]All section number references herein refer to Title 28 of the United States Code.

[2]Plaintiffs in each case are represented by the same counsel, and have filed substantially identical motions and arguments in support of remand.

1

6)

### B. *Wiersma v. A.W. Chesterton Co.*, Civ. No. 08-857

Plaintiff Janice Wiersma brought suit on or about January 29, 2008 against

numerous defendants on behalf of plaintiff-decedent Lee Wiersma. Janice Wiersma is

the executrix of Lee Wiersma's estate. (Civ. No. 08-857, D.I. 1, ex. A at ¶ 8) Lee

Wiersma served as a radio operator aboard the USS Wright between 1965 and 1969,

and allegedly was exposed to asbestos through turbines manufactured by GE. (*Id.*, D.I.

1, ex. A at ¶ 13; D.I. 5, ex. A) Lee Wiersma died from mesothelioma on July 1, 2007.

(*Id.*, D.I. 1, ex. 1)

## III. STANDARD OF REVIEW

The federal officer removal statute reads in pertinent part:

> (a) **A civil action** . . . commenced in State court against any of the
> following **may be removed by** them to the district court of the United
> States for the district and division embracing the place where it is pending.
>
> > (1) The United States or any agency thereof or **any officer
> > (or any person acting under that officer) of the United
> > States** or of any agency thereof, sued in an official or
> > individual capacity for any act under color of such office . . . .

§ 1442(a)(1) (emphasis added). The party removing an action to federal court bears

the burden of proving that removal is appropriate. *See Boyer v. Snap-On Tools Corp.*,

913 F.2d 108, 111 (3d Cir. 1990). The Third Circuit has held that the provisions of the

federal officer removal statute, § 1442(a)(1), are to be "broadly construed." *Sun Buick,

Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994); *see also, Megill v.

Worthington Pump, Inc.*, Civ. No. 98-076, 1999 WL 191565, at *2 (D. Del. Mar. 26,

1999). Indeed, the Supreme Court has held that "the right of removal is absolute for

**conduct performed under color of federal office**, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).' " *Ariz. v. Manypenny,* 451 U.S. 232, 242 (1981) (citation omitted) (emphasis added).

To establish removal jurisdiction under § 1442(a)(1), a defendant must establish the following:

> (1)  it is a "person" within the meaning of the statute;
> (2)  the plaintiff's claims are based upon the defendant's conduct "acting under" a **federal office**;
> (3)  it raises a colorable federal defense; and
> (4)  there is a causal nexus between the claims and the conduct performed **under color of a federal office**.

*Feidt v. Owens Corning Fiberglas Corp.,* 153 F.3d 124, 127 (3d Cir. 1998) (citing *Mesa v. California,* 489 U.S. 121, 129 (1989)) (emphasis added).  There is no dispute that GE, as a corporation, is a "person" within the meaning of the statute.  *See Good v. Armstrong World Indus., Inc.,* 914 F. Supp. 1125, 1128 (E.D. Pa. Jan. 18, 1996).

With respect to the second element, GE must establish that a "federal office"[3] was the source of the specific act for which the contractor now faces suit.  *See Holdren v. Buffalo Pumps, Inc.,* 614 F. Supp. 2d 129, 138 (D. Mass. May 4, 2009).  In both cases at bar, the gravamen of the complaints is GE's alleged failure to warn of the

---

[3]As seen above, the Third Circuit in *Feidt* used the phrase "federal office" (consistent with the Supreme Court's decision in *Arizona v. Manypenny*, 451 U.S. at 242), not the phrase "federal officer."  As a result, the distinction made by some courts between direction by the Navy and direction by a specific federal officer is not compelling.  *See, e.g., Good v. Armstrong World Indus.*, 914 F. Supp. at 1129.

dangers of asbestos.[4]  In order to show that a government contract displaces the state

tort law duty to warn under the federal contractor defense, a defendant

> must show that the applicable federal contract includes warning
> requirements that significantly conflict with those that might be imposed by
> state law. . . . The contractor must show that whatever warnings
> accompanied a product resulted from a determination of a government
> official, . . . and thus that the government itself "dictated" the content of
> the warnings meant to accompany the product.

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 630 (2d Cir. 1990).

To demonstrate that the federal government sufficiently controlled the warnings

issued in connection with GE's turbines, GE has submitted three affidavits.  GE's first

affidavit is the declaration of Admiral Ben J. Lehman ("Admiral Lehman").  (D.I. 5, ex.

B)[5]  Admiral Lehman is a retired Rear Admiral of the United States Navy.  While in the

Navy, Admiral Lehman served in a number of positions, including Ship Superintendent

at the Brooklyn Navy Yard (1942-44), Ship Superintendent at the San Francisco Naval

Shipyard (1950-52), and Planning Officer at the Assistant Industrial  Management

Office in San Francisco (1952-54).  He was promoted to Rear Admiral in the Naval

Reserve in 1977.  During his time away from the Navy, Admiral Lehman worked as an

engineer at GE (1946-48), and as the director of engineering and vice-president of

engineering at two major shipbuilding companies (1969-75).  In his affidavit, Admiral

Lehman attests "to the level of supervision and control by the United States Navy and

---

[4]Although plaintiffs have asserted claims which are not based on the failure to warn, for simplicity, the remaining discussion focuses on their failure-to-warn claims.

[5]Because of the duplicative nature of the records of these two actions, all docket index references henceforth are made to Civ. No 08-856.

4

its officers over every aspect of design and manufacture of equipment intended for installation on Navy vessels." (*Id.* at ¶ 2)  The declaration states that, in "the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment used on Navy ships. . . . **This control included the decision of what warnings should or should not be included.**" (*Id.* at ¶ 5) (emphasis added)  Based on his experience, Admiral Lehman believes that "equipment suppliers were prohibited from providing any warnings on or to accompany equipment supplied to the Navy without the consent and approval of the Navy." (*Id.* at ¶ 7)

GE also filed the affidavit of Lawrence Stillwell Betts, MD, PhD ("Dr. Betts") to support the proposition that the Navy possessed state of the art knowledge on the dangers of asbestos.  (D.I. 5, ex. C)[6]  Dr. Betts served in the Navy from 1972 to 2001. In his affidavit, Dr. Betts states that, "[d]uring the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a marine steam turbine on United States Navy ships known by a turbine manufacturer, like [GE], that was not known by the United States and the United States Navy." (*Id.* at ¶ 29)  Dr. Betts concludes that "[i]t would be unreasonable to assume that the Navy would have accepted unsolicited and gratuitous comments from equipment manufacturers about the hazards" of asbestos when the equipment manufacturers were not experts on the subject matter.  (*Id.* at ¶ 31)

David Hobson ("Hobson") was employed by GE between 1969 and 1996.  His

---

[6]This affidavit includes a voluminous appendix of more than 500 pages which provides documents showing the knowledge the Navy possessed with regard to asbestos during the relevant time period.

5

last position at GE was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine Department. Hobson's affidavit attests "to the extensive level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery, over GE's design and manufacture of Navy turbines." (D.I. 5, ex. D at ¶ 3) According to Hobson, GE performed all of its work on Navy turbines under the immediate supervision of the Navy. (*Id.* at ¶ 7) The Navy exercised control over all aspects of the design, manufacture and testing of turbines through "contract documents, . . . written specifications and personal oversight." (*Id.*) Specifically, government contracts which bound GE would incorporate pertinent specifications that "spell[ed] out in minute detail the Navy's requirements concerning every aspect of the materials and composition of devices like Navy turbines." (*Id.* at ¶ 8) Hobson states that the Navy "exercised absolute authority to determine precisely what hazards aboard ship would be subject to warnings and the . . . content of any such warnings." (*Id.* at ¶ 24)

Consistent with the above affidavits, the court concludes that GE has satisfied its burden to prove that plaintiffs' failure-to-warn claims are based upon GE's conduct "acting under" the office of the Navy and its officers. With respect to the next element, that is, whether GE has raised a colorable federal defense, GE has asserted the federal common law government contract defense. According to the Supreme Court, a federal contractor will not be liable for design defects in military equipment under state tort laws when:

(1) the United States approved reasonably precise specifications;
(2) the equipment conformed to those specifications; and
(3) the supplier warned the United States about the dangers in the use of the

6

equipment that were known to the supplier but not to the United States.[7]
*Boyle*, 487 U.S. at 512-513.  Based on the three affidavits provided by GE, the court
concludes that GE has raised a colorable federal defense, that is, the federal common
law government contract defense.  Moreover, the three affidavits satisfy the
requirement that GE sufficiently demonstrate a causal nexus between plaintiffs' failure-
to-warn claims and the Navy's control over the warnings provided by GE on its turbines.
Therefore, GE has established federal officer removal jurisdiction.

This conclusion is supported by similar decisions, based upon one or more of
these affidavits, that the federal officer removal statute has been satisfied where Navy
regulations required the use of asbestos and mandated what warnings were required
concerning asbestos.[8]  *See e.g., Pease v. A.W. Chesterton Co.*, Civ. No. 08-624, D.I.
36 (D. Del. Dec. 1, 2008);[9] *Chicano v. General Electric Co.*, Civ. No. 03-5126, 2004 WL

---

[7]"The first two of these conditions assure that . . . the design feature in question
was considered by a Government officer, and not merely by the contractor itself.  The
third condition is necessary because, in its absence, the displacement of state tort law
would create some incentive for the manufacturer to withhold knowledge of risks, since
conveying that knowledge might disrupt the contract but withholding it would produce no
liability." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512-13 (1988).

[8]The court recognizes that its decision in *Megill* is contrary to the above
conclusion.  However, the *Megill* decision was based on a different record, notably,
evidence such as that presented in the three affidavits filed in the cases at bar was not
presented by the defendant in *Megill*.  1999 WL 191565, at *4.

[9]The plaintiff, alleging injuries caused by asbestos exposure through GE turbines
aboard Navy ships, was represented by the same counsel who represents both
plaintiffs in the cases at bar.  (Civ. No. 08-624, D.I. 1)  In *Pease*, GE similarly removed
the case to federal court based on the federal officer removal statute.  *Id.*  GE relied on
the affidavits of Lehman, Betts, and Hobson to support removal to federal court.  (*Id.*,
D.I. 12)  Relying on the affidavits, the court found that GE had satisfied all the elements
of the federal officer removal statute.

2250990 (E.D. Pa. Apr. 6, 2004); *Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99

(D. Conn. Sept. 17, 2007) (holding that Lehman affidavit shows a causal nexus

between the claims and conduct performed under the color of a federal office); *Reaser*

*v. Allis Chambers Corp.*, Civ. No. 08-1296 (C.D. Cal. June 23, 2008) (relying on

Lehman and Betts affidavits to find removal appropriate for failure-to-warn claims

against GE related to asbestos use aboard Navy ships); *Nesbiet v. General Electric*

*Co.*, 399 F. Supp. 2d 205 (S.D.N.Y. Mar. 28, 2005) (relying on Hobson, Lehman and

Betts affidavits to find removal appropriate for failure-to-warn claims against GE related

to asbestos use in turbines on Navy ships).

The court notes that there are decisions rejecting evidence such as that

proffered by GE, instead requiring a higher threshold of evidence to establish federal

officer removal jurisdiction.  For instance, in *Holdren v. Buffalo Pumps, Inc.*, the district

court not only required the contractor to demonstrate that "the decision to warn must be

the government's, not the contractor's," but that the decision also "reflect a federal

interest incompatible with the important health and safety requirements of state law."

614 F. Supp. 2d at 137.  *See also, Good v. Armstrong World Indus.*, 914 F. Supp. at

1131 (because "asbestos is no longer used in the design and manufacture of

equipment," the lawsuit "does not threaten the enforcement of a federal policy sufficient

to warrant removal.").  While these considered opinions have merit, given that the

provisions of the federal officer removal statute are to be construed broadly,[10] and given

---

[10]Unlike the general removal statute, § 1441, which is to be construed so that all
doubts are to be resolved in favor of remand.  *Compare Sun Buick, Inc. v. Saab Cars
USA, Inc.*, 26 F.3d at 1262, *with Boyer v. Snap-on Tools Corp.*, 913 F.2d at 111.

8

that GE has produced evidence demonstrating a significant degree of control by a federal office over the warnings related to the dangers of asbestos, I respectfully reach a contrary conclusion.

## V. CONCLUSION

For the reasons stated above, the court denies plaintiffs' motions to remand the cases to State court.  An appropriate order will issue.

# Exhibit F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SAMUEL ALLEN, ET AL., | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3-09-cv-0497 (JCH) |
| | : | |
| GENERAL ELECTRIC CO. AND | : | |
| BUFFALO PUMPS, INC. | : | |
| | : | |
| | : | |
| Defendants. | : | AUGUST 27, 2008 |

**RULING RE: PLAINTIFF'S MOTION TO REMAND TO STATE COURT (Doc. No. 12)**

**I.      INTRODUCTION**

On March 3, 2009, Samuel Allen and eleven other plaintiffs filed a personal

injury action in the Connecticut Superior Court, Judicial District of Fairfield at Bridgeport.

On March 27, defendant Buffalo Pumps, Inc., removed this case to federal court.  See

Not. of Removal (Doc. No. 1).  On March 30, defendant General Electric Company

("GE") joined in the petition for removal.  See Joinder in Removal Pet. (Doc. No. 11).

The defendants removed pursuant to the federal officer statute, which permits removal

of state actions brought against an officer or agency of the United States, or a person

working under a federal officer.  28 U.S.C. § 1442(a)(1).  Plaintiffs now move to remand

to state court, arguing that this court does not have subject matter jurisdiction.  See

Mot. to Remand (Doc. No. 12).  For the reasons stated below, the court denies

plaintiffs' Motion for Remand.

1

## II.     FACTS

Plaintiffs are twelve men[1] who were employed by General Dynamics Corporation, Electric Boat Division, in Groton, Connecticut for various periods between 1956 and the present.  All worked in areas where they were exposed to asbestos and now suffer from asbestos-related diseases such as lung cancer, lung disease, asbestosis, and loss of lung function.  See Pl.'s Mem. in Supp. of Mot. to Remand ("Pl.'s Mem.") at 1-4 (Doc. No. 12).  Plaintiffs allege that their exposure to asbestos came at least in part from products the defendants manufactured for the Navy.  See Compl., Ex. 1 to Not. of Removal.

Buffalo Pumps manufactured and supplied pumps for Navy ships pursuant to contracts which included specifications for the use of asbestos.  See Not. of Removal at ¶¶ 5, 8.  GE manufactured marine steam turbines for use on Navy ships and submarines pursuant to detailed specifications and contracts, which included directions for the use of asbestos.  See Joinder in Removal Pet. ("Joinder") at ¶¶ 6-8.  In support of their Petition for Removal, Buffalo Pumps has provided affidavits from retired Rear Admiral Roger B. Horne and Martin A. Kraft, Buffalo Pumps' Production Manager, and an article by Samuel A. Forman, a specialist in preventative and occupational medicine, former Navy doctor, and expert in asbestos-related diseases.  GE provided several affidavits from David Hobson, a former engineer in the Coast Guard who served as the Manager of Navy Customer Service for GE's Navy and Small Steam Turbine

---

[1] Samuel Allen, Robert Benjamin, Charles Spralling, Gary Chapman, Michael Gladue, Ralph Godfrey, William Holland, Kenneth Jones, Billings Miner, William Molonson, Alan Patridge, and Charles Sprague.

Department.  GE also provided an affidavit from Lawrence Stillwell Betts, a retired Navy

Captain and current president of a medical corporation that specializes in preventive

medicine, and one from retired Rear Admiral Ben J. Lehman.  Plaintiffs provided the

court with an affidavit from Robert Bruce Woodruff, a retired Navy Captain who served

as a vice president and Division General Manager for a company manufacturing steam

turbines following his retirement from the Navy.

**III.    DISCUSSION**

This case is nearly identical to a number of other cases recently removed to this

district.  In fact, many of those cases involved either Buffalo Pumps, or GE, or both, as

defendants.  Buffalo Pumps and GE provided the court with the same supporting

documents that they presented in the previous cases.  See, e.g., Pantalone v. Aurora

Pump Co., et al., 576 F. Supp. 2d 325 (D.Conn. 2008) (Arterton, J.) (finding federal

officer removal appropriate but denying removal as untimely filed); DeMatties v. Acmat

Corp., 2008 U.S. Dist. LEXIS 86717 (D. Conn. 2008) (Eginton, J.) (finding federal

officer removal appropriate); Carroll v. Buffalo Pumps, 2008 U.S. Dist. LEXIS 86715 (D.

Conn. 2008) (Eginton, J.) (same); Machnik v. Buffalo Pumps, 506 F. Supp. 2d 99 (D.

Conn. 2007) (Droney, J.) (same); Contois v. Able Industries, Inc., 523 F. Supp. 2d. 155

(D. Conn. 2007) (Thompson, J.) (same).  In all of these cases, the court found that

federal officer removal was appropriate.  The plaintiffs have failed to distinguish these

cases.[2]

---

[2] Plaintiffs argue that it is significant that the plaintiffs in this case were civilians, not employees of the U.S. Navy.  See Pl.'s Mem. at 5.  However, it is the defendants' status as government contractors which is relevant for federal officer removal; plaintiffs' status is immaterial.

3

The federal officer removal statute permits removal of cases brought against "[t]he United States or any agency thereof or officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official capacity for any act under color of such office. . . ." 28 U.S.C. § 1442(a)(1). This is a statutory exception to the well-pleaded complaint rule that a federal defense alone does not qualify a case for removal to federal court. See Louisville-Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908).

Because Buffalo Pumps and General Electric are not federal officers, in order to remove this case they must demonstrate: (1) that they are persons within the meaning of the statute who acted under a federal officer; (2) that they performed the actions for which they are being sued under color of federal office; and (3) that they have a colorable federal defense. See Isaacson v. Dow Chemical Co., 517 F3d. 129, 135 (2d Cir. 2008) (citing Jefferson County v. Acker, 527 U.S. 423, 431 (1991)). Although the burden of showing that federal jurisdiction exists lies with the party seeking removal, the Supreme Court has held that federal officer removal should not be constrained by a "narrow, grudging interpretation." See Jefferson County, 527 U.S. at 431. The defendant need not "virtually win his case before he can have it removed," because the purpose of section 1442(a)(1) is to have the federal defense tried and determined in federal court. See id. In determining whether jurisdiction is proper, the court should "look only to the jurisdictional facts alleged in the Notice[] of Removal." See In re Methyl Tertiary Butyl Ether Prods. Liabl. Litig., 488 F.3d 112, 124 (2d Cir. 2007).

4

A.    "Persons" "Acting Under" a Federal Officer

Buffalo Pumps and GE are "persons" within the meaning of the federal removal statute, which includes corporate persons.  See Isaacson 517 F.3d at 136.  However, defendants must also show that they were "acting under" a federal officer: "an entity 'acts under' a federal officer when it 'assists, or helps carry out, the duties or tasks of the federal superior.'"  See Isaacson, 517 F.3d at 137 (quoting Watson v. Philip Morris Cos., 551 U.S. 142, 152 (2007)).  Just as the defendants in Isaacson "contracted with the Government to provide a product that the Government was using during war – a product that, in the absence of defendants, the Government would have had to produce itself," so did Buffalo Pumps and GE provide pumps and marine steam turbines, respectively, to the U.S. Navy pursuant to specific contracts.  See Isaacson, 517 F.3d at 137; Not. of Removal at ¶ 4; Joinder at ¶ 6.  Buffalo Pumps and GE had "received delegated authority" to complete their contracts and were therefore helping carry out the duties of their federal superior.  See Isaacson, 517 F.3d at 137.  Buffalo Pumps and GE thus fulfill the "acting under" requirement for federal officer removal.

B.    "Under Color of" Federal Office

The second requirement for federal officer removal is that the defendant performed the actions for which they are being sued "under color of" federal office.  This is known as the causation requirement.  See Isaacson, 517 F.3d at 137.  The plaintiffs argue that Buffalo Pumps and GE must provide "credible, specific, or candid evidence" that the Navy prohibited them from including warnings about asbestos in their products in order to fulfill this prong.  See Pl.'s Mem. at 28.  This is too high a bar for this requirement, which only calls for a general connection between the action sued

5

upon and the governmental function defendants were fulfilling.  The Second Circuit recently stated that the bar for this requirement is "quite low."  See Isaacson, 517 F.3d at 137.  "To show causation, defendants must only establish that the act that is the subject of plaintiffs' attack . . . occurred while defendants were performing their official duties."  Id. at 137-38 (internal citations omitted).  Courts should "credit defendants' theory of the case when determining whether a causal connection exists."  Id. at 137.

The actions sued upon in this case are plaintiffs' personal injuries, which they claim are a result of asbestos exposure while working in a shipyard.  See Compl., Ex. 1 to Not. of Removal.  Defendants argue that the Navy exercised complete control over all aspects of their production of asbestos-containing components, including written materials and warnings.[3]  See Def. Buffalo Pumps' Opp. to Pl.'s Mot. for Remand ("Buffalo's Opp.") at 5-10.  In Isaacson, the Second Circuit found that defendants had fulfilled the causation requirement because they were carrying out detailed contracts with the government for the manufacture of Agent Orange.  See id.  Because Buffalo Pumps and GE are in a similar position, they have demonstrated a causal link between the action on which plaintiffs sued and their official duties.

C.    Colorable Federal Defense

Finally, defendants must raise a colorable federal defense.  Buffalo Pumps and GE raise the government contractor defense, as set forth in Boyle v. United Techs.

---

[3] As noted above, plaintiffs argue that defendants must provide "credible, specific or candid evidence that they were required or directed by the Navy to omit warnings from their products" in order to satisfy this requirement. See Pl.'s Mem. at 28.  Even if the plaintiffs' high burden were the law, Buffalo Pumps and GE have met it – because they have provided affidavits stating that the Navy would have rejected any products onto which they added their own warnings.  See Affidavit of Roger B. Horne, Jr., Ex. 2 to Not. of Removal ("Horne Aff."), at ¶ 22; Affidavit of David Hobson, Jan. 28, 2008 ("Hobson Jan. 2008 Aff."), Ex. 6 to Def. GE's Mem. in Opp. of Pl's Mot. to Remand ("GE's Opp."), at ¶ 21.

Corp., 487 U.S. 500, 512 (1987), and modified to fit a failure-to-warn case[4] in In re Joint

E. and S.D.N.Y. Asbestos Litig. ("Grispo"), 897 F.2d 626, 630 (2d. Cir. 1990).  Buffalo

Pumps and GE must show: (1) "government control over the nature of product

warnings"; (2) "compliance with the Government's directions"; and (3) "communication

to the Government of all product dangers known to it but not to the Government." See

Densberger v. United Techs. Corp., 297 F.3d 66, 75 (2d Cir. 2002) (quoting Grispo, 897

F.2d at 630 n.4).  It is important to note that to earn federal officer removal, the federal

defense need only be colorable – not "clearly sustainable" or one that "will ultimately

prevail."  See Willingham v. Morgan, 395 U.S. 402, 407 (1969); Isaacson 517 F.3d at

139.  Additionally, it is enough here to rely on defendants' assertions.  See Isaacson

517 F.3d at 139.  "One of the most important reasons for [federal officer] removal is to

have the validity of the defense . . . tried in a federal court."  See Willingham, 395 U.S.

at 407.  Through their notices for removal and supporting affidavits, Buffalo Pumps and

GE have met the three elements of the government contractor defense.

       1.      Government Control Over the Nature of Product Warnings

     The Navy tightly controlled the nature of warnings that government contractors

could place on the products they created.  According to Rear Admiral Horne, "the Navy

. . . had detailed specifications that governed the form and content of written materials

to be delivered with equipment . . . supplied to the Navy."  See Horne Aff. at ¶ 12.

David Hobson supports this: "The Navy exercised intense direction and control over all

written documentation and any safety or caution information that the Navy, in its sole

---

[4] For the purposes of their Motion to Remand, the plaintiffs have focused solely on their failure-to-warn claims.  See Pl.'s Mem. at 10 n.5.

7

discretion, directed be provided with these turbines." See Affidavit of David Hobson,

Feb.4, 2005, Ex. 5 to GE's Opp., at ¶ 2.

       2.     Compliance with the Government's Directions

      As for the second element, defendants argue that they did not provide warnings

because they were complying with the Navy's requirements.  "A manufacturer such as

Buffalo Pumps would not have been permitted to include a warning regarding asbestos

in an equipment manual or on a product label." See Horne Aff. at ¶ 14.  "Unless

expressly directed to do so by the Navy, GE was not permitted, under the

specifications, associated regulations and procedures, and the actual practice as it

existed in the field, to affix any type of warning to a Navy turbine. . . .  To affix such

extraneous matter . . . would take the turbine out of compliance." See Hobson Jan.

2008 Aff. at ¶ 21.  These statements demonstrate that defendants were acting in

compliance with the Navy's directions.

      Plaintiffs argue that defendants must "establish with affirmative evidence that, in

fact, the federal agency would have or did prohibit them from affixing warnings to their

products." See Pl.'s Mem. at 21.  Plaintiffs provide evidence rebutting defendants'

claims of compliance in the form of an affidavit from Captain Robert Bruce Woodruff,

who argues that it is "more likely than not [that] such a warning label would definitely

have been considered." See Affidavit of Robert Bruce Woodruff, Ex. 3 to Pl.'s Mem., at

14.  This dispute goes beyond the issues to be resolved in a motion for remand and into

the issues to be resolved at trial.  While Buffalo Pumps and GE may need to prove with

"affirmative evidence" that the Navy prohibited them from adding warnings to their

products in order to avoid liability, the defendant need not "virtually win his case before

he can have it removed." See <u>Jefferson County</u>, 527 U.S. at 431.

              3.      Communication of All Dangers Known to Defendants but not to the Government

Finally, both Buffalo Pumps and GE state that the Navy was well aware of the dangers that asbestos posed, and was the leading expert in the field of asbestos hazard control.[5]  There were no dangers known to the defendants that were not also known to the Navy.  See Affidavit of Lawrence Stillwell Betts, Ex. 7 to GE's Opp. at ¶¶ 27-28, 30; see also Samuel A. Forman, <u>U.S. Navy Shipyard Occupational Medicine through World War II</u>, 30 J. Occup. Med. 28 (1988), Ex. 4 to Not. of Removal. Therefore, Buffalo Pumps and GE met all three elements and have demonstrated that they have a colorable government contractor defense.

Buffalo Pumps and GE have satisfied the test for federal officer removal by "persons" not themselves federal officers: they demonstrated that they were acting under a federal officer, that there was a causal connection between the action sued upon and their official duties, and that they have a colorable federal defense.  Because Buffalo Pumps and GE have satisfied the <u>Isaacson</u> test, the court denies plaintiffs' motion for remand.

---

[5] Plaintiffs argue that the Navy's leadership in occupational medicine and its health monitoring programs are irrelevant because they were civilian employees of a civilian employer.  See Pl.'s Mem. at 5-6.  However, defendants do not need to demonstrate that the Navy had "exclusive control and regulatory authority over the health and safety of these plaintiffs," as plaintiffs argue.  Id. at 6.  The government contractor defense only requires the defendant to demonstrate that they communicated "all product dangers known to [them] but not to the [Navy]."  See Densberger, 297 F.3d at 75.  The Navy's leadership in the field of occupational medicine is relevant to what it knew about asbestos, and it is undisputed that the Navy was well aware of the potential health hazards of using asbestos.  Therefore, this argument fails.

9

IV.    **CONCLUSION**

Plaintiffs' Motion for Remand is DENIED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 27th day of August, 2009.


/s/ Janet C. Hall
Janet C.  Hall
United States District Judge

# Exhibit G

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT WRIGHT JR., | No. C07-05403 MJJ |
| Plaintiff, | **ORDER DENYING MOTION TO REMAND** |
| v. | |
| A.W. CHESTERTON COMPANY INC, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Plaintiffs Albert Wright, Jr. ("Mr. Wright") and Marva Wright's (collectively, "Plaintiffs") Motion to Remand. (Docket No. 23.) Defendants Foster Wheeler ("Foster Wheeler") and Leslie Controls ("Leslie Controls") (collectively, "Defendants") oppose the Motion.[1] For the following reasons, the Court **DENIES** the Motion.

## FACTUAL BACKGROUND

This is a personal injury action arising out of injuries allegedly sustained by Mr. Wright due

---

[1] Plaintiff objects to Leslie Controls' Joinder in Foster Wheeler's Notice of Removal and Leslie Controls' Joinder in Foster Wheeler's Opposition to this Motion. Whether or not Leslie Controls may join the Notice of Removal is not, however, dispositive of this Motion because any defendant can unilaterally remove a case under § 1442. *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (explaining that a federal officer or agency defendant can unilaterally remove a case under § 1442). Therefore, for purposes of this Motion, the Court need not determine whether Leslie Controls' may join in Foster Wheeler's Notice of Removal. However, once the case is removed by Foster Wheeler, the Court perceives no reason why Leslie Controls may not Join in Foster Wheeler's Opposition to Plaintiff's Motion to Remand. In addition, Leslie Controls filed its joinder in the opposition not less than 21 days before the hearing date with both the Court and Plaintiffs. (*See* Plf.'s Objection, Docket No. 44 at 2.) The Court therefore perceives no prejudice from Leslie Control's failure to efile. *See* Civ. L.R. 7-3(a).

**United States District Court**
For the Northern District of California

1   to exposure to Defendants' asbestos and asbestos-containing products. (*See* Keller Decl., Exh. A

2   ("Complaint") ¶¶ 10-15.) Plaintiffs allege that Mr. Wright contracted lung cancer as a result of his

3   exposure to these products during his employment as a machinist and flange turner, among other

4   places, for the Navy. (*Id.* ¶¶ 11, 36-37, Exh. A.) Mr. Wright worked aboard twenty-six or more

5   Navy ships and vessels in his career.[2] (*See id.* at Exh. A.)

6          Plaintiffs filed this asbestos action on September 13, 2007 in San Francisco County Superior

7   Court against Defendant Foster Wheeler, Leslie Controls and dozens of other defendants. (*See*

8   Keller Decl., Exh. A ("Complaint").) Plaintiffs brought claims of negligence, strict liability, false

9   representation, intentional tort, premises owner/contractor liability and loss of consortium. (*See*

10  Complaint at 1.) Plaintiffs argue, in this Motion, that Plaintiffs' claims against Foster Wheeler are

11  based only on its failure to warn about the dangers of asbestos that Foster Wheeler incorporated into

12  the design and manufacture of its boilers. (Plfs.' Mem. of P. & A. at 14.) Indeed, in the Complaint,

13  Plaintiffs "disclaim any cause of action or recovery for any injuries and damages resulting from

14  exposure to asbestos caused by the acts or omissions of defendants committed at the specific

15  direction of an officer of the United States Government acting within his official capacity." (*See*

16  Complaint ¶ 9a.) Foster Wheeler filed a Notice of Removal on October 23, 2007. (*See* Notice of

17  Removal, Docket No. 1.) Plaintiffs now seek an order remanding this case to state court.

18                                **LEGAL STANDARD**

19         Pursuant to 28 U.S.C. § 1441(a), a defendant in a civil action may remove a case from state

20  court to federal district court if the district court has subject matter jurisdiction over the case. The

21  Court strictly construes the removal statute against removal and Defendants have the burden of

22  establishing that removal jurisdiction is proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566-67 (9th

23  Cir. 1992).

24         Removal pursuant to 28 U.S.C. § 1442, however, is different. Pursuant to 28 U.S.C. §

25  1442(a)(1), a civil action may be removed by "[a]ny officer of the United States or any agency

26  _____

27         [2] Mr. Wright worked aboard various Navy vessels including, but not limited to, the USS Midway, USS Enterprise, USS Kitty Hawk, USS Coral Sea, USS Oriskany, USS Constellation, USS Mount Hood, USS John F Kennedy, USS

28  Hancock, USS Ticonderoga, USS Providence, USS Mount Baker, USS Mauna Kea, USS Pigeon, USS Pyro, USS Guitarro, USS Drum, USS Pintado USS Hawkbill, USS Permit, USS Swordfish, USS Halibut, USS Grayback, USS Brinkley Bass, USS Trigger, and USS Wahoo.

2

United States District Court
For the Northern District of California

1  thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1).

2  To satisfy this provision a party must "(1) demonstrate that it acted under the direction of a federal

3  officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus

4  between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v.*

5  *Abex Corp.*, 816 F.Supp. 569, 517 (N.D.Cal. 1992) (citing *Mesa v. California*, 489 U.S. 121, 124-

6  125, 134-135 (1989)).[3]

7          Unlike removal under § 1441(a), the presumption under § 1442 is in favor of removal. *See*

8  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252-53 (9th Cir. 2006). In *Durham*, after a

9  review of the relevant case law, the Ninth Circuit stated that "when federal officers and their agents

10  are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* at

11  1252. The Court further explained that "[b]ecause it's so important to the federal government to

12  protect federal officers, removal rights under section 1442 are much broader than those under

13  section 1441." *Id.* at 1253 (noting that the breadth of the removal rights are exemplified by, inter

14  alia, the fact that under § 1442 a federal officer can remove a case even if the plaintiff could not have

15  filed the case in federal court to begin with, that removal under § 1442 is not subject to the well-

16  pleaded complaint rule and that a federal officer or agency can unilaterally remove a case under

17  section 1442).[4]

18                                          **ANALYSIS**

19          Plaintiffs argue that Defendants fail to establish that Foster Wheeler acted under the direction

20  of a federal officer, raised a colorable federal defense, or established a causal nexus between its

21  alleged action under the control of a federal officer and Plaintiffs' claims. Plaintiffs also raise

22  evidentiary objections to Defendants' evidence.

23  _____

24      [3] The removing party must also qualify as a federal officer or person acting under the same. As a corporation,
Foster Wheeler meets this requirement. *See Fung*, 816 F.Supp. at 572. Additionally, the parties do not contend otherwise.

25      [4] Plaintiffs correctly argue that the Ninth Circuit, in *Durham*, was confronted with the question of whether the
26  removal petition was timely, so the court did not reach the merits of the defendant's removal petition. Plaintiff understates,
however, the breadth of the holding in *Durham*. While *Durham* needed only to determine the timeliness question, the Court
analyzed the history of § 1442. In so doing, the Circuit's determination that there should be a presumption in *favor* of
27  removal was not limited to the mere question of timeliness. In addition, the Circuit makes the presumption determination
in order to come to its final holding. Thus, the language regarding the breadth and presumption in favor of removal was not
28  dicta, but essential to the holding and thus binding. A recent decision from this court interpreted it as such and accordingly
denied a motion to remand. *See Ballenger v. AGCO*, No. C 06-2271, 2007 WL 1813821 (N.D. Cal. June 22, 2007).

3

United States District Court

For the Northern District of California

1    Defendants, on the other hand, argue that they have submitted sufficient evidence on each of

2 the required elements for removal under § 1442 in both their Notice of Removal and the exhibits

3 attached to their Opposition to this Motion.  The Court turns first to the evidentiary challenges, then

4 to the merits.

5    I.    **Evidentiary Issues**

6    In the instant case, Defendants submit four declarations.  Plaintiff raises evidentiary

7 objections to all four.  The general contours of these objections are outlined in this section.  Below,

8 in the discussion on the merits, if the outcome relies on evidence that is specifically challenged, it

9 shall be so noted and the objection resolved.

10    The first two declarations, attached to Defendant's Notice of Removal, are the declarations

11 of J. Thomas Schroppe, a retired Foster Wheeler executive, and Ben J. Lehman, a retired Rear

12 Admiral of the United States Navy.  These declarations are offered for the purpose of demonstrating

13 that Foster Wheeler was subject to government specifications and oversight in all aspects of the

14 design of its boilers, including the relevant warnings attached thereto.  (*See* Affidavit of J. Thomas

15 Schroppe, Notice of Removal, Exhibit B and Affidavit of Ben J. Lehman, Notice of Removal,

16 Exhibit C).  Plaintiffs object to the admissibility of these affidavits for four reasons.  (*See* Plfs.'

17 Evid. Obj.)  First, Plaintiffs argue that under Federal Rule of Evidence ("FRE") 402, the challenged

18 evidence is not relevant.  Next, under FRE 602, Plaintiffs contend that the witnesses do not have

19 personal knowledge of the matters asserted.  Third, some of the evidence is purportedly inadmissible

20 hearsay under FRE 802.  Finally, Plaintiffs argue that these declarations violate the best evidence

21 rule, under FRE 1002-1004.[5]

22    As a general matter, none of these objections are meritorious.  First, the declarations are

23 relevant to this Motion because they are related to the Navy's level of control over Foster Wheeler's

24 production activities.  (*See* Notice of Removal, Exhs. B, C.)  Mr. Wright alleges that his injuries

25 were caused by his work on at least twenty-six Navy ships, not just one or even a small handful.

26 While Defendants only cite one ship by name in their Notice of Removal, they note that the

27 _____

28    [5] While Plaintiffs refer to the "secondary evidence rule" and cite FRE 1003, the Court presumes, given the description of the objection, that the objection is based on FRE 1002.

4

1   allegations are related to "exposure while working on, among other ships, the USS Constellation."

2   (*See* Notice of Removal at 2.)  Thus, evidence regarding general navy practices, as it relates to the

3   Navy's contracts with Foster Wheeler, is both relevant and appropriate.  Insofar as Plaintiff argues

4   that the testimony is not relevant because these declarations are dated prior to the inception of this

5   action in state court, this argument is unavailing.  The fact that the declaration pre-dates the

6   inception of the suit does not undermine the relevance of the practices testified to, all of which

7   occurred prior to the date the declaration was signed.

8       Next, both Schroppe and Lehman testify to their personal knowledge of the facts contained in

9   the declaration.  Schroppe states that he is personally familiar with the degree of supervision and

10   control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for

11   boilers and auxiliary equipment because he was personally involved in such contracts at all the

12   various stages of contracting.  (*See id.*, Exh. B at 2.)  Lehman testifies that his years of experience

13   with the Navy have caused him to be thoroughly familiar with U.S. Navy specifications and the

14   means by which the U.S. Navy controlled its contracts and inspection procedures.  (*See id.*, Exh. C

15   at 9.)  Thus, Schroppe and Lehman's testimony regarding the Navy's contracting and specifications

16   related to Foster Wheeler boilers is based on personal knowledge.  Third, insofar as specific

17   statements are inadmissible hearsay, this will be taken up as is relevant, below.  However, as a

18   general matter, the majority of the challenged statements are based on personal knowledge, not an

19   out of court statement, and are not inadmissible hearsay.  Finally, these declarations do not violate

20   the Best Evidence Rule.  Under FRE 1002, "to prove the content of a writing, recording, or

21   photograph, the original writing, recording, or photograph is required."  Here, Schroppe and

22   Lehman, in their declarations, do not attempt to prove the content of a writing, recording or

23   photograph.  While the declarations cite various specifications that are also written, such as the

24   Military Specifications ("Mil Specs"), they rely on their independent knowledge of the contents and

25   therefore need not submit the document/s themselves.

26       The third declaration, by Thomas J. Moses, counsel for Foster Wheeler, includes a copy of

27   Plaintiffs' Preliminary Asbestos Litigation Statement, a copy of a Government Purchase Order, and

28   a copy of a District Court case.  (Moses Decl., Exhs. A-C.)  Plaintiff objects to the Purchase Order,

United States District Court
For the Northern District of California

1   arguing that it never references the USS Constellation and Defendant's attorney never establishes a

2   foundation for its authenticity or how he is qualified to submit or interpret it. (Plfs.' Reply at 9.)

3   The Court agrees that the Government Purchase Order lacks some foundation and specificity.

4   However, the Court need not determine the admissibility of this document as the Court need not rely

5   on it to resolve this Motion.

6          Finally, the fourth declaration, by Lawrence Stilwell Betts ("Betts"), includes forty-five

7   exhibits. Plaintiffs generally object to the entire declaration on the same grounds that they object to

8   the Schroppe and Lehman declarations. As above, as a general matter, these objections are not

9   meritorious. However, insofar as the Court's decision relies on specific portions of the Betts

10  declarations, the objections thereto are considered below.

11         Plaintiffs also argue that the Court should not consider the Betts declaration because it was

12  untimely. The Court, however, finds this argument unavailing. First, Plaintiffs contend that a

13  removal notice cannot be amended or supplemented after the time for removal has expired. (*See*

14  Plfs.' Reply at 5.) While this may be the case, Defendants do not seek to amend their removal

15  notice. In addition, the issues raised in the Betts declaration, and attached exhibits, were generally

16  raised in Defendants' Notice of Removal. (*See* Notice of Removal, Exh. C at 14-15.) Thus, the

17  untimeliness argument is unavailing. In addition, the Betts declaration was filed with the Court on

18  December 17, 2007, more than the requisite time in advance of the January 29, 2008 hearing in this

19  matter. While Defendants failed to efile the exhibits, the Court received copies on December 17,

20  2007 and Plaintiffs received copies on December 18, 2007, also more than 21 days before the

21  hearing in this matter. Thus, while Defendants may have committed a procedural error in filing this

22  declaration, the Court perceives no prejudice from the Court's consideration of the Betts declaration

23  in resolving this matter.

24  **II.     The Merits**

25          a.     **The First and Third *Mesa* Prongs: Foster Wheeler acted under the direction of a**

26                 **federal officer and Foster Wheeler demonstrated a causal nexus.**

27          Under *Mesa*, Defendants must establish that Foster Wheeler acted under the direction of a

28  federal officer. 489 U.S. at 121, 134-45. In addition, Defendants must establish that there is a

United States District Court

For the Northern District of California

1    causal nexus between Plaintiff's claims and Foster Wheeler's actions under the control of a federal

2    officer. *See id.* Defendants contend that they have established both of these prongs. The Court

3    agrees.

4        To show that Defendants acted under the direction of a federal officer, Foster Wheeler cannot

5    simply show that the "relevant acts occurred under the general auspices of a federal officer, such as

6    being a participant in a regulated industry." *Fung*, 816 F. Supp. at 572 (quotations omitted).

7    Instead, "[a] majority of courts have held that the federal official must have 'direct and detailed

8    control' over the defendant." *Id.* (quoting *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947

9    (E.D.N.Y. 1992).

10       Relying on *Good v. Armstrong World Industries*, 914 F.Supp. 1125 (E.D.Pa. 1996), Plaintiffs

11    contend that Foster Wheeler must also cite a specific federal officer who designed, manufactured or

12    even directed the design and manufacture of the boilers present in the Navy vessels and installations

13    identified in Plaintiffs' Complaint. (Plfs.' Mem. of P. & A. at 8-9.) Plaintiffs, however, provide no

14    authority establishing that this is a requirement in the Ninth Circuit. In fact, such a finding would be

15    in potential conflict with the removal standard enunciated in *Durham*. Thus, Plaintiffs have not

16    shown that Defendants, in this circuit, are required to cite a specific federal officer, as long as they

17    show that they acted under the requisite direct and detailed control of a federal official. *See Fung*,

18    816 F. Supp. at 572.

19       Here, Defendants have provided sufficient evidence supporting a finding that the Navy had

20    direct and detailed control over their ability to place asbestos warnings on their boilers provided to

21    the Navy. Under contracts between Foster Wheeler and the Navy for boilers and auxiliary

22    equipment, the Navy was responsible for all design aspects and approved the equipment at multiple

23    steps along the way. (*See* Notice of Removal, Exh. B. ("Schroppe Decl") ¶¶ 2, 5, 8, 9, 12, 14, 19.)

24    In addition, the Navy exercised significant direction and control over the contents of all written

25    documentation to be delivered with the naval boilers. (*Id.* ¶ 21.) Under the Navy's precise

26    specifications, Foster Wheeler was not permitted to affix any type of warning or caution statement to

27    a piece of equipment intended for installation onto a Navy vessel, beyond those required by the

28

7

United States District Court
For the Northern District of California

1   Navy. (*Id.* ¶ 22.)[6]

2       Plaintiffs offer no contradictory evidence. Instead, Plaintiffs argue that there is no evidence

3   that the asbestos-containing components were anything other than standard stock equipment. (Plfs.'

4   Mem. of P. & A. at 10.) However, the evidence presented by Defendants establishes that the boilers

5   that Foster Wheeler designed and manufactured for the Navy were subject to specific design

6   requirements and control that resulted in equipment that was specific to the needs of the Navy and

7   not standard stock equipment. In addition, Plaintiffs argue that Defendants' evidence is insufficient

8   and contradictory. However, perceiving no real contradictions in the evidence, and given the

9   presumption in favor of removal under *Durham,* this evidence is sufficient to establish the Navy's

10  direct and detailed control over Defendants' design of the boilers and the warnings attached thereto.

11      Next, Plaintiffs argue that there is no causal nexus because there is no proof that a specific

12  federal officer directed Foster Wheeler about warnings specifically. However, as discussed above,

13  there is no requirement that Defendants cite a specific federal officer by name, as long as the

14  requisite direction, control and causal nexus is established. In addition, Defendants offer evidence

15  that the Navy would not permit Foster Wheeler to affix any type of warning or caution statement to a

16  piece of equipment intended for installation onto a navy vessel, beyond those required by the Navy.

17  (*See* Schroppe Decl. ¶ 22; Lehman Decl. ¶ 14.) As Lehman testified, "[t]o do so would have

18  interfered with the U.S. Navy's mission and control of its ships and personnel." (Lehman Decl. ¶

19  14.) Thus, Defendants have established a causal nexus between Plaintiff's claims and Foster

20  Wheeler's actions under the control of a federal officer.[7]

21      **b.    Second *Mesa* Prong: Foster Wheeler raises a colorable federal defense to**

22              **Plaintiffs' claims.**

23      Foster Wheeler urges the Court to determine its right to remove under 28 U.S.C. 1442(a)(1)

24  in light of the government contractor's defense set forth in *Boyle v. United Technologies Corp.,* 487

25  _____

26  [6] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
    The objections to these sections of the Schroppe declaration are the same boilerplate objections discussed above and the
27  evidence is admissible for the same reasons already stated.

28  [7] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
    The objections to these sections of the Schroppe and Lehman declarations are the same boilerplate objections discussed above
    and the evidence is admissible for the same reasons already stated.

1   U.S. 500 (1988).  As discussed more fully below, the Court finds that there is sufficient evidence in

2   the record to raise a colorable government contractor defense.

3          In *Boyle*, the Supreme Court found that liability arising from state law, here the duty to warn,

4   may not be imposed in instances where "(1) the United States approved reasonably precise

5   specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the

6   United States about the dangers in the use of the equipment that were known to the supplier but not

7   to the United States."  *Id.* at 512.  As noted above, Plaintiffs waive all claims against Foster Wheeler

8   save for those arising from a failure to warn.  (*See* Complaint ¶ 9a.)  The Ninth Circuit clarified the

9   contractor defense as it applies to failure to warn claims in *Butler v. Ingalls Shipbuilding, Inc.*, 89

10  F.3d 582, 586 (9th Cir. 1996).  The court in *Butler* found the contractor defense to be "inapplicable

11  to a failure to warn claim in the absence of evidence that in making its decision whether to provide a

12  warning . . . [defendant] was acting in compliance with reasonably precise specifications imposed on

13  [it] by the United States."  *Id.* at 586 (quotations omitted).

14         In the instant case, as discussed above, Defendants provide sufficient evidence, by way of the

15  Schroppe and Lehman declarations, that satisfies the first and second prongs of the *Boyle* test; the

16  United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's

17  equipment conformed to these specifications.  The outstanding question, therefore, is whether

18  Defendants submit sufficient evidence to establish the third prong; whether Foster Wheeler warned

19  the United States about the dangers in the use of the equipment that were known to Foster Wheeler

20  but not to the United States.

21         Defendants submit two declarations to support their contention that Foster Wheeler did not

22  have any knowledge about the dangers of the use of asbestos that were not known to the United

23  States Navy.  First, Lehman testified that the U.S. Navy was well aware of the dangers of asbestos

24  and conducted extensive research concerning the hazard of exposure to asbestos, thus staying abreast

25  of the latest information, including the results of research.  (Lehman Decl. ¶ 13.)  The Navy made

26  deliberate decisions on the allocation of its resources in light of this knowledge.  (*Id.*)  Next,

27  Defendants submit the declaration of Lawrence Stilwell Betts, a retired Navy captain and medical

28  professional who is familiar with the industrial products used by the Navy, the Navy work

9

United States District Court
For the Northern District of California

1  environments and the Navy occupational health program.  Betts testified that the Navy controlled

2  asbestos exposure consistent with the then current state of accepted scientific and medical

3  knowledge balanced by needs for national defense.  (Betts Decl. ¶ 31.)  Betts further testified that

> [t]he Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art.  During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos containing products used on or in boilers and auxiliary equipment on United States Navy ships known by a boiler manufacturer, like Foster Wheeler, that was not known by the United States government and the United States Navy.

(Betts Decl. ¶ 32.)[8]

Plaintiff, in response, argues that, inter alia, Defendants have failed to establish that the Navy had knowledge about the dangers of using Foster Wheeler's asbestos-containing equipment or boilers specifically.  However, the testimony above regarding the Navy's superior knowledge is only part of the record before the Court.  Betts testifies that the Navy had the most current knowledge regarding the dangers of asbestos.  Schroppe and Lehman's testimony further establishes that the Navy knew of, and in fact required, the specific design parameters for the boilers made by Foster Wheeler.  Thus, if the boilers contained asbestos, then it was by design, known by the Navy, and was approved and/or required by the Navy.  The warnings regarding such asbestos were also according to, and limited by, the specifications set forth by the Navy.  Thus, Plaintiff's argument that the Navy did not have knowledge about the asbestos contained in Foster Wheeler's boilers is unavailing.  Plaintiffs also present other related arguments challenging the Betts declaration.  Each argument, like their primary argument, discussed above, is similarly unavailing given the totality of the evidence in the record.

The Court is mindful that Defendants need only present a colorable federal defense to Plaintiff's claims and need not prove that the defense will be meritorious.  *See Mesa*, 489 U.S. at 128; *Ballenger*, 2007 WL 1813821 at *4.  Here, on this record, the Court finds that Defendants have established that they have a colorable federal defense.

//

---

[8] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Lehman and Betts declarations
are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

10

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** the Motion to Remand.  Pursuant to the clear language in *Durham*, the Court must interpret § 1442 broadly in favor of removal.  Given the evidence in the record, Defendants have established the requisite basis for removal.

**IT IS SO ORDERED.**

Dated: February 21, 2008

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

11

# Exhibit H

 LexisNexis·

**DAVID A. MARLEY, et al., Plaintiffs, vs. ELLIOT TURBOMACHINERY CO., INC., et al., Defendants.**

**CASE NO. 07-23042-CIV-JORDAN**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION**

*545 F. Supp. 2d 1266; 2008 U.S. Dist. LEXIS 33715*

**March 12, 2008, Decided**
**March 13, 2008, Entered**

**COUNSEL:** [**1] For David Marley, Plaintiff: Case A. Dam, LEAD ATTORNEY, Ferraro Law Firm, Miami, FL; David Aaron Jagolinzer, LEAD ATTORNEY, Ferraro & Associates, Miami, FL.

For Pauline E. Marley his wife, Plaintiff: Case A. Dam, LEAD ATTORNEY, Ferraro Law Firm, Miami, FL; David Aaron Jagolinzer, LEAD ATTORNEY, John Joseph Clark, LEAD ATTORNEY, Ferraro & Associates, Miami, FL.

For Elliott Turbomachinery Co., Inc., Defendant: Edward Joy Briscoe, LEAD ATTORNEY, Helaine S. Goodner, LEAD ATTORNEY, Fowler White Burnett, Miami, FL.

For Viad Corporation f/k/a The Dial Corporation, Defendant: Abigail Morrison Cohen, LEAD ATTORNEY, Conroy Simberg Ganon Krevans & Abel, Hollywood, FL.

For Cleaver Brooks, Defendant: Timothy Clark, LEAD ATTORNEY, Timothy Clark, Plantation, FL.

For Buffalo Pumps Inc., Goodyear Tire & Rubber Company, Velan Valve Corp., Defendants: Kathleen Margaret LaBarge, LEAD ATTORNEY, Bice Cole Law Firm, Coral Gables, FL.

For Warren Pumps LLC, General Electric Company, Defendants: Evelyn Fletcher, LEAD ATTORNEY, Hawkins & Parnell, Atlanta, GA.

For Carrier Corporation, Defendant: David M. Hawthorne, LEAD ATTORNEY, Hugh J. Turner, Jr., LEAD ATTORNEY, Akerman Senterfitt & Eidson, Fort Lauderdale, FL.

For [**2] Crane Co., Defendant: Rebecca Carrie Kibbe, LEAD ATTORNEY, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Miami, FL.

For Ingersoll-Rand Company, Defendant: Steven A. Edelstein, Coral Gables, FL.

For American Optical Corporation, Defendant: Hugh J. Turner, Jr., LEAD ATTORNEY, Akerman Senterfitt & Eidson, Fort Lauderdale, FL.

For Garlock Sealing Technologies LLC, John Crane, Inc., Greene, Tweed & Company, Inc., Foster Wheeler Energy Corp., Defendants: M. Stephen Smith, III, LEAD ATTORNEY, Rumberger Kirk & Caldwell, Miami, FL.

For Alfa Laval Inc., Defendant: Frank Joseph Sioli, Jr, LEAD ATTORNEY, Brown Sims, P.C., Miami, FL.

For Kentile Floors, Inc., Defendant: Lori Anne M. Rovner, LEAD ATTORNEY, Virginia Easley Johnson, LEAD ATTORNEY, Foley & Mansfield, P.L.L.P., Miami, FL.

For General Motors Corporation, Defendant: Henry Salas, LEAD ATTORNEY, Cole, Scott, & Kissane P.A., South Miami, FL.

545 F. Supp. 2d 1266, *; 2008 U.S. Dist. LEXIS 33715, **

For E.I. Dupont De Nemours and Company, Defendant: Sergio Edward Pagliery, Shook Hardy & Bacon, Miami, FL.

For Goulds Pumps, Inc., Defendant: Peter Joel Frommer, LEAD ATTORNEY, Hinshaw & Culbertson, Fort Lauderdale, FL.

**JUDGES:** Adalberto Jordan, United States District Judge.

**OPINION BY:** Adalberto Jordan

**OPINION**

[*1269] **AMENDED ORDER DENYING MOTION [**3] TO REMAND**

Elliott Turbomachinery and Viad removed this action to federal court pursuant to *28 U.S.C. § 1442(a)(1)*. Pending is the plaintiffs' motion to remand, arguing that the defendants had not sufficiently shown a federal colorable defense and a nexus between this action and their official duties. For the reasons stated below, the motion to remand [D.E. 2] is DENIED.

**I. FACTUAL BACKGROUND**

This action is in essence a dispute about the defendants' ability, under their contract with the Navy, to warn Mr. Marley that unprotected asbestos exposure could cause mesothelioma and other ailments. The defendants were retained by the Navy in the 1940s to manufacture numerous ship parts and devices for the *U.S.S. Lake Champlain*. The manufactured products contained asbestos but did not have any type of warning about the dangers of unprotected asbestos exposure.

Mr. Marley was a Navy sailor assigned to the *Lake Champlain* from 1959-1983. During his assignment, he was allegedly exposed to the asbestos contained in the defendants' products. As a result of this exposure, he allegedly developed mesothelioma. This suit is brought by Mr. Marley and his wife.

Elliot and Viad removed this action under *§1442(a)(1),* [**4] invoking federal officer jurisdiction. In support of removal, Elliot filed the affidavits of retired Admiral Ben J. Lehman and retired Admiral Roger B. Horne. [1]

    1 Viad joined Elliot's removal filings.

**A. ADMIRAL LEHMAN**

Admiral Lehman joined the United States Navy in 1942 and remained on active duty until 1946. He served as ship superintendent and dry docking officer at the Brooklyn Navy Yard between 1942 and 1944. In 1950, he was assigned as a ship superintendent at the San Francisco Naval [*1270] Shipyard. During his Naval service, he was personally responsible for the creation of Navy specifications for the procurement of materials and machinery used on Navy vessels. He is familiar with Navy specifications, equipment manuals, and qualified product lists, which are used in the construction and repair of Navy and commercial ships. *See* Lehman Aff. at PP 1-2.

Admiral Lehman states that in the 1940s and 1950s, "the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings ... Thus the Navy controlled the decision making with respect to instructions and warnings [**5] on every piece of equipment." *See id.* at P 7. Admiral Lehman further states that the "Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment ... The Navy determined the nature of hazards to be subject to any precautionary handling and the content of any such labeling." *See id.* at P 8.

Admiral Lehman's conclusion is (1) that manufacturers and suppliers were prohibited from providing any warning without the consent of the Navy, and (2) that "certain types of warnings would not have been approved by the Navy given the necessary performance needs and capabilities of the shipboard equipment, the ships, and Navy personnel. This would have included, but not been limited to, any potential warnings associated with asbestos including, but not limited to, recommendations regarding respiratory protection and repair and maintenance practices." *See id.* at P 10. According to Admiral Lehman, prior to the mid 1960s, the Nevy relied on its own occupational health program to provide training and prevent the hazards of asbestos to shipyard workers. *See id.* at PP 11, 13 (c).

**B. ADMIRAL HORNE**

Admiral Horne is a retired rear admiral of the [**6] United States Navy. He began his career in 1956. Throughout his Navy career, he concentrated in the areas of ship design, engineering, construction, overhaul, and inspection. He achieved the rank of chief engineer and deputy commander at the Naval Sea Systems Command for Ship Design and Engineering. *See* Horne Aff. at P 2.

According to Admiral Horne, it was common for the Navy to send inspectors to the plants of manufacturers to assure conformance with the Navy specifications and requirements. *See id.* at P 7. He also states that the Navy specifications covered the nature of any communication

Case 1:10-cv-22891-AJ   Document 1-6   Entered on FLSD Docket 08/09/2010   Page 55 of 73

Page 3

545 F. Supp. 2d 1266, *; 2008 U.S. Dist. LEXIS 33715, **

affixed to products supplied to the Navy by third parties. "Vendors such as Defendants would not have been permitted (either under the specifications or, as a matter of Navy practice) to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos, without prior discussion, approval and acceptance by the Navy." *Id.* at P 12.

Admiral Horne concludes that any warning affixed by a vendor "would have been rejected as contrary to the Navy protocols for instruction and training relating to use of asbestos materials." *See id.* "The Navy [**7] determined to address the potential hazards of asbestos on Navy ships through training and not through warnings." *See id.* at P 14.

## II. ANALYSIS

I conclude that removal of this action was appropriate under the federal officer removal statute.

A state-court action against any person acting under the direction of an [*1271] officer of the United States or its agencies can be removed to federal court pursuant to § 1442(a)(1). The purpose of § 1442(a)(1) is to permit the removal of "those actions commenced in state court that expose a federal official to potential civil liability or criminal penalty for an act performed ... under color of office." *See Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1427 (11th Cir. 1996)*(internal citations omitted). The statute reflects Congress' intent "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties." *See id.* As such, § 1442(a)(1) is an exception to the well-pleaded complaint rule, which generally precludes removal where a federal question is not apparent within the four corners of the complaint. *See Mesa v. California, 489 U.S. 121, 136-37, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989).*

Removal under § 1442(a)(1) generally depends on the [**8] satisfaction of two separate requirements. First, the defendant must "*advance* 'a colorable defense arising out of [his] duty to enforce federal law.'" *See Magnin, 91 F.3d at 1427* (internal citations omitted, emphasis added). Second, the defendant must establish that the suit is for acts performed "under the color of office." This requirement is satisfied by showing "'a causal connection' between what the officer has done under asserted official authority and the action against the defendants." *See id. See also Jefferson Co. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*(internal citations omitted). I find that the defendants have made a sufficient showing on both requirements.

### A. A COLORABLE DEFENSE

The defendants have advanced a colorable federal defense to the plaintiffs' claims. A colorable defense is a defense that is "plausible." *See Magnin, 91 F.3d at 1427 (citing Mesa, 489 U.S. at 129).* In construing the colorable federal defense requirement, the Supreme Court has rejected "a narrow grudging interpretation" of the term, "recognizing that 'one of the most important reasons for removal is to have the validity' of the defense of official immunity tried in a federal court." *See Jefferson, 527 U.S. at 432 [**9] (internal citations omitted). See also Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969) ("We ... do not require the officer virtually to " win his case before he can have it removed.")* Thus, a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage. All a removing defendant needs to do is to make a showing that his federal defense "is not without foundation and made in good faith." *See Nesbiet v. Gen. Electric, 399 F.Supp.2d 205, 211 n.44 (S.D.N.Y. 2005) (internal citations omitted).*

With this standard in mind, I turn to the federal defense advanced in this case. The defendants have raised a federal contractor defense to the plaintiffs' failure to warn claims. *See* Not. of Removal [D.E. 1] at P 9. The defendants contend that their "alleged failure to warn of the hazards of asbestos resulted from the Navy's prohibition of such warnings." *See id.* at 10.

The Supreme Court recognized the federal contractor defense in *Boyle v. United Techs., Corp., 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988). Boyle* involved the crash of a United States Marine helicopter in a training exercise off the Virginia coast. The pilot survived the accident impact, but [**10] he could not open the helicopter's outward escape hatch and drowned. The pilot's estate sued the manufacturer of the helicopter, alleging that the escape hatch should have been designed to open inward to facilitate escape. The manufacturer's [*1272] defense was that it had designed the helicopter pursuant to government specifications requiring an escape hatch that swung outward. On these facts, the Court held that liability for design defects in military equipment could not be imposed under state law when (1) the government approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about dangers known to the supplier but not known to the United States. *See 487 U.S. at 512.*

The Eleventh Circuit extended the holding of *Boyle* to failure to warn claims in *Dorse v. Eagle-Picher Indus., Inc., 898 F.2d 1487, 1489 (11th Cir. 1990).* [2] Like this case, *Dorse* involved a claim that a manufacturer had failed to warn about the hazards of asbestos. The court noted that the federal contractor defense bars liability when (1) the case concerns an area of uniquely federal

545 F. Supp. 2d 1266, *; 2008 U.S. Dist. LEXIS 33715, **

interest and (2) there is "a significant conflict" between [**11] an identifiable federal policy or requirement and a state law duty. The defense fails as a matter of law, however, if the contractor can "comply with both its contractual obligations and the state-prescribed duty of care." *See id. at 1489* (internal citation omitted). [3]

> 2   The *Dorse* panel adopted the reasoning of the district court's order granting summary judgment in favor of the plaintiff on the defendant's government contractor defense.
> 3   The Eleventh Circuit ultimately concluded that the defendant had failed to produce sufficient evidence indicating that his contractual obligations prevented compliance with the state law duty to warn and entered summary judgment in favor of the plaintiff. *See 898 F.2d at 1489.* The summary judgment standard is obviously significantly higher than the colorable defense standard.

The parties do not dispute that the procurement of Navy vessels (and parts for those vessels) is an area of uniquely federal interest. *See Boyle, 487 U.S. 504-505* (civil liability arising from performance of procurement contracts with government is an area of "uniquely federal interest"); *Dorse, 898 F.2d at 1489* ("procurement of asbestos in World War II for naval ships is undeniably [**12] an area of uniquely federal interest"). The dispute in this case is whether the defendants have shown a "good faith foundation" to argue that there was a conflict between their contractual obligations with the Navy and the state law duty to warn.

To satisfy their burden, the defendants have filed the affidavits of Admiral Lehman and Admiral Horne. According to Admiral Lehman, in the 1940s and the 1950s the Navy dictated every aspect of the warnings associated with its ships and did not permit deviation by any of its contractors. He concludes that the Navy would have rejected any asbestos warning suggested by the defendants as contrary to their policy to deal with the asbestos problem through training and not through warning. *See* Lehman Aff. at P 10. Admiral Horne concurs with Admiral Lehman and states that "any request to include a warning regarding asbestos in an equipment manual would have been rejected as contrary to Navy protocols for instruction and training relating to use of asbestos materials." *See* Horne Aff. at P 15.

The affidavits of Admiral Lehman and Admiral Horne are not unique to this case. Almost identical affidavits have been filed by the defendants in lawsuits all over [**13] the country. District courts, however, are split on whether these are sufficient to "advance" a colorable government contractor defense.

In *Nesbiet*, for example, the court concluded that the affidavits were sufficient to [*1273] satisfy the removing defendant's burden. The court emphasized that at this stage of the proceedings the defendant had to "demonstrate merely that its claim to the military contractor defense is 'colorable.'" *See 399 F.Supp.2d at 212.* Similarly, in *Harris v. Rapid American Corp.*, the court recently held that the affidavits, albeit general in nature, were sufficient to support removal. *See 532 F. Supp. 2d 1001 (N.D.Ill. 2007). See also Contois v. Able Indus., Inc., 523 F.Supp.2d 155, 160 (D.Conn. 2007); Ballenger v. Agco Corp., 2007 U.S. Dist. LEXIS 47042, 2007 WL 1813821 (N.D.Cal. June 22, 2007).*

On the other hand, several courts have held that these type of affidavits are too general and vague to satisfy the removal burden of proof. *See e.g., Hilbert v. McDonnell Douglas Corp., 529 F. Supp. 2d 187 (D.Mass. 2008); Westmiller v. IMO Indus., Inc., 2005 U.S. Dist. LEXIS 29371, 2005 WL 2850334, *2 (W.D. Wash. Oct. 20, 2005); Schilz v. A.P. Green Indus., Inc., 2002 U.S. Dist. LEXIS 1176, 2002 WL 102608, *1 (N.D.Cal. Jan. 15, 2002).*

After reviewing [**14] these cases, I conclude that the affidavits of Admirals Lehman and Horne are sufficient to "advance" a colorable federal contractor defense. Without a doubt, the affidavits are lacking on specificity and leave a lot of room for speculation. But at this stage, they do provide a good faith foundation to show (1) that the Navy controlled the warnings to be affixed on parts manufactured by independent contractors, and (2) that the Navy was likely to reject any asbestos warning given its policy to deal with the asbestos problem exclusively through training.

I agree that the Admirals' depositions in other cases suggest that they do not know of any instance when the Navy prohibited a warning proposed by a manufacturer or supplier. I also understand that there is a dispute as to whether the Navy manuals encouraged or prohibited the use of warnings. These arguments undermine the credibility of the Admirals, and raise a number of questions that the defendants will have to answer to ultimately prevail on their defense. But that is a merits question for another day. I do not need to determine credibility or likelihood of success at the removal stage. Factual disputes about the Admirals' testimony [**15] should be resolved in federal court as long as the defendants have a good faith foundation for their contractor defense. *See Magnin, 91 F.3d at 1427-28.* Because I find that the defendants have satisfied this low standard, removal was proper.

## B. CASUAL NEXUS AND "ACTING UNDER" REQUIREMENTS

Case 1:10-cv-22891-AJ Document 1-6 Entered on FLSD Docket 08/09/2010 Page 57 of 73

Page 5
545 F. Supp. 2d 1266, *; 2008 U.S. Dist. LEXIS 33715, **

Although some courts treat the casual nexus and "acting under" requirements separately, both issues tend to "collapse into a single requirement: that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct order or to comprehensive detailed regulations." *See In re Methyl Tertiary Butyl Ether Prod., 488 F.3d 112, 125 (2d Cir. 2007). See also Magnin, 91 F.3d at 1429* (analyzing both requirements together). In other words, the defendants need to show that "his relationship to the plaintiff 'derived solely from his official duties.'" *See Magnin, 91 F.3d at 1427-28* (citing *Willingham, 395 U.S. at 406*).

It is undisputed at this stage that the defendants manufactured and supplied the asbestos-containing products in the course of their contractual relationship with the Navy. Admiral Lehman's affidavit sufficiently establishes that the defendants were acting [**16] under federal authority when they supplied the asbestos-containing parts without warnings. Admiral Lehman generally states that the Navy has control over "what warnings should or should not be included." *See* Lehman Aff. at P 7. He [*1274] further states that "the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment." *See id.* Therefore, there is no question that the defendants' relationship with the plaintiff derived solely from the defendants' official duties. This is sufficient to establish a casual nexus under *Magnin. See 91 F.3d at 1429*

The plaintiffs suggest that the defendants need to show that the Navy actually prohibited asbestos warnings to establish a "casual nexus" at the removal stage. I disagree. "Just as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County, 527 U.S. at 432-33*. All a defendant needs to do to show a casual nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract [**17] with the Navy. *See Magnin, 91 F.3d at 1427-28*. This the defendants have done. [4]

4   The recent Supreme Court decision in *Watson v. Philip Morris Co., 127 S.Ct. 2301, 168 L. Ed. 2d 42 (2007)* is not helpful to the plaintiffs' position. *Watson* stands for the proposition that "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *See 127 S.Ct. at 2308*. As the Court explained the term "acting under" requires "an effort to assist, or to help carry out the duties or tasks of the federal superior." *See id. at 2307*. Here, plaintiffs' own complaint indicate that the defendants were hired by the Navy to manufac-

ture the ship parts and devices that the Navy ultimately installed in the *Lake Champlain. See* Compl. Exposure Sheets. This is sufficient to show that the defendants helped carry out the Navy's duties or tasks.

## C. DISCLAIMER

Finally, I reject the plaintiffs' argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand. In their complaint, the plaintiffs allege that:

> Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an [**18] act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office.)

Compl. at P 5.

This disclaimer is circular. Its applicability depends on a determination of the core question in this case: whether the defendants's purported omission - the failure to warn - was required or caused by their contractual relationship with the Navy. If the failure to warn was required by the Navy, the disclaimer applies and the plaintiffs' claims fail as a matter of law. If the failure to warn was not required by the Navy, then the disclaimer does not apply. The problem with this argument is that the defendants have the right to have this question decided in federal court. *See Jefferson, 527 U.S. at 432* (defendants have a right to have "the validity" of the defense of official immunity tried in a federal court").

I understand that a number of courts have found that federal liability disclaimers defeat removal under § 1442(a)(1). *See e.g., Westbrook v. Asbestos Defendants, 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642, *3 (N.D.Cal. July 31, 2001)*. The disclaimers in those cases, however, waived any liability arising out of work done on federal premises, irrespective [**19] of whether the work was done under the requirements of a federal agency or not. In contrast, the disclaimer here is more limited and is contingent on the Navy's contractual limitations and specifications. [*1275] I am reluctant to find that the plaintiffs can defeat a government contractor's right to remove by disclaiming any claim arising from any act or omission compelled by a government agency. Such a circular disclaimer would defeat the purpose § 1442(a)(1) as it would force federal contractors to prove in state court that they were acting under the direction of the government.

545 F. Supp. 2d 1266, *; 2008 U.S. Dist. LEXIS 33715, **

**III. CONCLUSION**

In sum, while Admiral Lehman's and Admiral Horne's affidavits fall far short from establishing that the defendants were not able to warn Mr. Marley about the danger of unprotected asbestos exposure, they are sufficient to "advance" a colorable government contractor defense and establish a nexus between this action and the defendants' official duties. Removal was appropriate. Accordingly, the plaintiffs' motion to remand is denied.

Unless this case is transferred to the Multi-District Litigation Panel before then, the parties shall file the joint scheduling report required by Local Rule 16.1(B)(2) by [**20] March 21, 2008.

DONE and ORDERED in chambers in Miami, Florida, this 12th day of March, 2008.

/s/ Adalberto Jordan

Adalberto Jordan

United States District Judge

# Exhibit I

### AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1.     I am a 1962 graduate of the New York State Maritime College with a degree in Marine Engineering. For three months in 1962, I worked as a Third Assistant Engineer for American Export Lines. I began my career at Foster Wheeler in 1962 as a Proposal Engineer in the Marine Department. As a Proposal Engineer, I was responsible for taking shipyard specifications and designing a boiler to meet the thermal performance and physical requirements of those specifications. In 1967, I became the Manager of the Proposal Department and reviewed all proposals. In 1977, I was promoted to Vice President of Engineering at which point I supervised both proposal and contract execution activities. From 1978 to 1982, I was President of Foster Wheeler Boiler Corporation. In 1982, I became Managing Director of Foster Wheeler U.K. From 1984 to my retirement in 1999, I was Executive Vice President of Foster Wheeler Power Systems.

2.     I am personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary equipment because I was personally involved in such contracts at all the various stages of development, from inquiry and bid through production, testing, and sea trials and, ultimately, acceptance.

3.     I submit this affidavit to attest to the degree of involvement, supervision, direction and control exercised by the U.S. Navy and its authorized agents and officers in connection with procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval vessels. The following paragraphs describe the contract process from the perspective of Foster Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the Navy agents and personnel through the various stages of a given contract.

4.     Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5.     The Navy was responsible for all phases of the design of a vessel, which was accomplished by the Naval architect. Specifically, the Naval architect would prepare the ship design which involved the entire vessel, including the machinery space, and all performance requirements. In general, the ship design for any given class of ship would be contained in a Ship Specification ("Ship Spec") which covers all aspects of the vessel including the machinery space. As it relates to the boiler, the Ship Spec would cover all boiler operating criteria, performance requirements, and maximum physical dimension of the boiler(s). In general, the Ship Spec was written and prepared by the naval architect and approved by the Navy and, in the course of its projects with the Navy, Foster Wheeler was required to design, fabricate and furnish equipment which complied strictly with the requirements in the Ship Spec.

6.     In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7.     The normal process by which Foster Wheeler sold marine boilers and economizers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer at Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8.     The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9.     During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10.     Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11.     The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12.     The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec. at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13.     The boiler specifications would provide detailed requirements for the boiler and economizer and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a)    Boiler, superheater and economizer tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b)    Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c)    Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14.    At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15.    The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16.    During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17.     Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The economizers were always shop assembled since they could be shipped by rail. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18.     The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19.     A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20.     Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21.     In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers and economizers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent

directed by the Navy.

22.     Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 18th day of December, 2009 at Newark, New Jersey.

J. Thomas Schroppe

THE STATE OF NEW JERSEY

ESSEX COUNTY                    )

Personally appeared before me this 18th day of December, 2009, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this 18th day of December, 2009.

My commission expires 11/9/2010

Notary Public

MARIAN P. TIGHE-KRUSHINSKY
Notary Public of New Jersey
My Commission Expires 11/9/2010

# Exhibit J

**AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL**

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.      I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received

notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S.

Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I

attended the College of the City of New York. I had been a "student engineer" at the Mack

Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at

Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College

of the City of New York in order to complete my course work there and then enter military

service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S.

Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute

of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at

Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of

Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress

Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship

Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the

Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco

Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant

Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an

Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was

employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel

Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major

shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

     2.     I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

     3.     During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

     4.     The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships: for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5.      Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5.      The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6.      Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7.      These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8.    The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9.    The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

    a.    it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

    b.    it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

    c.    every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10.    The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.     In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.     The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.     Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14.    The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal  acknowledge.

Executed this __12th__ day of __July__ 2007.

On this 12 day of 07, 2007, before me, a Notary Public,

__Josh Martin__ 

MY COMMISSION EXPIRES __August 28, 2010__

JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-109087-5
MY APPT. EXPIRES AUGUST 28, 2010