*Gale Lyautey and Patricia Lyautey v. Alfa Laval, Inc. et al.*,
Case No. 10-35086CA31, Circuit Court of the
11th Judicial Circuit in and for Miami-Dade County, Florida

## AFFIDAVIT OF MARTIN K. KRAFT

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | ) SS. |
| **COUNTY OF NIAGARA** | ) |

I, Martin K. Kraft, being under penalty of perjury, declare and say:

1. I currently am the Production Manager for the Buffalo Pumps Division of Air & Liquids Systems Corporation. I began my career with the Buffalo Pumps Division of Buffalo Forge Company in 1980. I have held various positions with the Buffalo Pumps Division of Buffalo Forge Company, Buffalo Pumps, Inc., and the Buffalo Pumps Division of the Air & Liquids Systems Corporation (collectively "Buffalo Pumps").

2. I am knowledgeable regarding the United States Navy ("Navy")'s involvement in and control over the design and manufacture of pumps it purchased from Buffalo Pumps because I have participated in the design, manufacture, and testing of these pumps. I also have conducted a review of available documents and information regarding similar matters prior to my employment with Buffalo Pumps.

3. Buffalo Pumps has for years made and supplied pumps for Navy ships under contracts between Buffalo Pumps and shipyards and/or the United States of America, specifically the Navy Department.

4. At all relevant times, inspectors from the Navy and/or the Department of Defense were assigned to be present at Buffalo Pumps' manufacturing facility in North Tonawanda, New York. The inspectors were responsible for conducting process surveillance to assure compliance

of work being done pursuant to Navy contracts. The inspectors examined pumps at various phases of construction and at "hold points" specified in the contract to determine whether Buffalo Pumps' work complied with the contract and applicable specifications. The inspectors had the authority to reject production of a particular pump at any point if its construction deviated from specified design, material and performance requirements. Additionally, the inspectors observed testing of pumps and provided final acceptance of pumps for shipment to the Navy when specified. The inspectors have office space within the Buffalo Pumps facility itself.

5. The manufacture of pumps for use on Navy vessels is governed by an extensive set of general and specific federal standards and specifications, chiefly military specifications known as "MilSpecs." The MilSpecs governed all aspects of a pump's design and construction and specified the materials to be used, including materials such as gaskets and packing used in pumps. Among the most commonly-applicable MilSpecs for Navy pumps manufactured by Buffalo Pumps have been Mil-P-17639 ("Pumps, Centrifugal, Miscellaneous Service, for Use on Naval Ships") (attached as Exhibit A) and Mil-P-17840 ("Pumps, Centrifugal, Close-Coupled, Navy Standard") (attached as Exhibit B), and their predecessors and successors.

6. MilSpecs governed numerous aspects of the pump design and manufacture, including the designation of materials to be used in construction. Among numerous other requirements, the specifications state that "[p]ump casing joints shall be made up using compressed asbestos sheet gaskets." (Exhibit A, at 3.4.1.5; Exhibit B, at 3.26).

7. The initial conceptual design for pumps on all classes of Navy vessel was developed under the direction of BUSHIPS, and later NAVSEA. When Buffalo Pumps became involved in the design phase for a new pump, it did so pursuant to Navy technical and performance requirements dictating the weight, size, power output, speed, and other relevant

design parameters of the pump. The Navy also imposed various material, testing and other requirements with respect to pumps.

8. In the design phase of the pump project, as in all other phases, the Navy retained ultimate decision authority over the design of the pumps. If engineering disagreements arose between the Navy and an outside design consultant, the Navy controlled the design adopted. All pumps supplied by Buffalo Pumps to the Navy were built in accordance with the Navy specifications or other technical documentation identified in applicable contract documents.

9. Not only did pumps manufactured and supplied by Buffalo Pumps for Navy vessels have to meet detailed and precise Navy specifications, but each pump's configuration was controlled by the Navy's specified performance requirements for the vessel or class of vessels in question. In other words, the pumps for a vessel or class of vessels were engineered for a specific application and were custom-built.

10. Equipment designed and supplied for the Navy usually was not "off the shelf" product. Pumps built for use on Navy ships were subject to different and much stricter design, manufacturing and performance standards than pumps that Buffalo Pumps manufactured and marketed for commercial, non-military customers. Through its specifications, the Navy imposed requirements that made the pumps it procured different in fundamental ways from pumps supplied for commercial applications.

11. Most significantly, pumps supplied to the Navy were required to and were designed to be resistant to combat conditions and damage. Navy specifications imposed strict standards for "shockproofness" – *i.e.*, resistance to combat damage to the vessel and/or the spaces where the pumps were located. (Exhibit A at 3.1; 3.3.15; 4.3.10-17; Exhibit B at 3.1; 3.10; 4.2.8-15). Compliance with these shockproofness requirements necessitated unique design

and engineering to ensure the necessary strength and durability for battle conditions. The Navy's shockproofness testing subjected pumps to impacts designed to simulate the effect of torpedoes, bombs or other explosives striking a vessel.

12.     The Navy also dictated other characteristics unique to Navy pump applications that differed from pumps sold to commercial customers. These included, for example: stringent endurance requirements, and the testing to document them, that differed from standard commercial standards and expectations (Exhibit A at 4.1.2; Exhibit B at 4.4.2); use of different metals – gun metal, nickel-copper alloys, specialized bronzes, and other materials – not frequently used by Buffalo Pumps in non-military applications (Exhibit A at 3.4.1.7; Exhibit B. at 3.2.1-2); "standard" Navy sizes for input and output piping and, therefore, for the associated flanges on the pumps, that differed from those in commercial industry (Exhibit A at 3.3.16.8; Exhibit B at Fig. 1-6.); special hardware and fittings that differed from those in standard use in commercial applications (Exhibit A at 3.3.22); and specialized welding procedures different from standard welding used on commercial pumps (Exhibit A at 3.3.2.4).

13.     In addition, Navy specifications or other technical documents identified in applicable contract documents required Buffalo Pumps to submit for approval and acceptance by the federal government drafts of any manuals, drawings or other written materials required to be provided with regard to pumps it manufactured for the Navy. These requirements were far more detailed and stringent than those imposed by commercial customers. (Exhibit A at 3.5; 3.6; Exhibit B at 3.27; 3.28).

14.     This approval and acceptance process was not merely a process of submission by Buffalo Pumps of drawings and manuals. The Navy's review encompassed all aspects of the technical manuals and other written materials submitted to it for approval in the pump design and

manufacture process. Based on my experience and my review of historical materials, I am aware that the Navy required specific changes to the content and wording of manuals submitted by Buffalo Pumps and other naval equipment manufacturers. These changes included specific edits to cautionary and instructional language, and including warnings and cautions. Examples of correspondence of this type are attached as Exhibit C.

15. Once those manuals, drawings or other written materials were approved and accepted by the Navy, they were assigned Navy identification numbers, essentially becoming Navy documents.

_____
Martin K. Kraft

Sworn to and subscribed
before me this 9 day
of August 2010.

_____
NOTARY PUBLIC

BEVERLY G. WITKOP
Notary Public, State of New York
Qualified in Niagara County
My Commission Expires 5/8/13

*Gale Lyautey and Patricia Lyautey v. Alfa Laval, Inc. et al.*,
Case No. 10-35086CA31, Circuit Court of the
11th Judicial Circuit in and for Miami-Dade County, Florida