*Gale Lyautey and Patricia Lyautey v. Alfa Laval, Inc. et al.*,
Case No. 10-35086CA31, Circuit Court of the
11th Judicial Circuit in and for Miami-Dade County, Florida

## AFFIDAVIT OF ROGER B. HORNE, JR.

| | | |
|---|---|---|
| **STATE OF WASHINGTON** | ) | |
| | ) SS. | |
| **COUNTY OF KITSAP** | ) | |

I, Roger B. Horne, Jr., being under penalty of perjury, declare and say:

1. I am a retired Rear Admiral of the United States Navy, in which I served between 1956 and 1991. A copy of my curriculum vitae is attached as Exhibit A and my relevant work history and experience are discussed below.

2. I began my Navy career in 1956, immediately after receiving a Bachelor of Science degree in Naval Engineering from the United States Naval Academy at Annapolis, Maryland. I have also received extensive post-graduate education in naval engineering, including a Master of Science Degree in Mechanical Engineering from the U.S. Naval Postgraduate School, and have taught Naval Engineering as a Visiting Professor at the University of Michigan. Throughout my Navy career, I concentrated in areas of ship design, engineering, construction, overhaul and inspection. Ultimately, I achieved the rank of Chief Engineer and Deputy Commander, Naval Sea Systems Command ("NAVSEA") for Ship Design and Engineering. Prior to that, I served as Deputy Commander, NAVSEA for Facilities and Industrial Management; Commander, Puget Sound Naval Shipyard; Commander, Engineering Duty Officer School; Production and Repair Officer, Mare Island Naval Shipyard; Nuclear Engineering Manager, Puget Sound Naval Shipyard; Nuclear Submarine Inspection Officer, Supervisor of Shipbuilding Office, Ingalls Shipyard and Chief Engineer on the *USS Ozbourn* (DD846).

3. During my time in the Navy, I was also responsible for maintaining naval ship military specifications and for monitoring compliance with the specifications by all vendors and contractors of naval equipment. Military specifications ("MilSpecs") were applicable to equipment manufacturers, including pump manufacturers like Buffalo Pumps, Inc. ("Buffalo Pumps"). Equipment manufacturers, Naval Machinery Inspectors and others relied on these MilSpecs to ensure strict compliance with NAVSEA demands and requirements for combat-ready vessels.

4. In addition to my training and experience in Navy ship construction, as outlined above, I have been recognized for achievements in the field of marine machinery and engineering, and have received three Navy Legion of Merit Awards and three Meritorious Service Awards for Engineering and Industrial Achievement and an award from the Marine Machinery Association.

5. Based on my experience, I can attest to the level of supervision, direction and control exercised by the Navy over the design and manufacture of equipment, including centrifugal pumps and related equipment, intended for installation on Navy vessels. In addition, I have personal knowledge of the comprehensive plans, specifications and requirements which governed suppliers like Buffalo Pumps of equipment for use aboard Navy ships such as *USS Beatty* (DD-756), *USS Tutuila* (ARG-4), *USS Cavalla* (SS-244), USS Hissem (DE-400), *USS Constant* (AM/MSO-427), *USS Barber County* (LST-1195), *USS Direct* (AM/MSO-430). More particularly, I can attest that any and all work performed on pumps built and supplied for these ships by vendors such as Buffalo Pumps was performed to the requirements specified by the Navy, and that the work was reviewed and inspected by Navy personnel in the vendor's plant and in the shipbuilding yards. In many instances during my career I personally inspected

equipment, including pumps, to verify conformance with the requirements specified, although more immediate supervision typically was exercised by officers and other Navy personnel under my command or the command of NAVSEA or its predecessor, the Bureau of Ships ("BUSHIPS").

6. The Navy chain of command concerning ship construction involves several layers of authority related to technical and contractual control over Navy shipbuilding. The Secretary of the Navy has ultimate authority over the Navy and Navy shipbuilding; immediately below the Secretary, as has been the case since the creation of NAVSEA, is the Chief of Naval Operations ("CNO"), to whom NAVSEA reports. Prior to the establishment of NAVSEA, BUSHIPS controlled all combat ship design and construction and reported to the CNO as well as a civilian Assistant Secretary. Since the creation of NAVSEA, NAVSEA reports to the CNO for all military ship design and construction.

7. Under the command of NAVSEA, as was the case with BUSHIPS, the Navy's shipbuilding structure was comprised of several divisions and levels of authority concerning ship design, construction, repair and inspection. Technical and contractual control over shipboard equipment and material was directed by the Commander of Naval Sea Systems and the Commander of Naval Supply. Each of these two organizations had oversight responsibility concerning, among other things, pumps built for Navy vessels. Compliance with the standards and specifications required for pumps built for Navy use was directly monitored by Naval Machinery Inspectors under both of these divisions: the Machinery Inspectors under Naval Supply worked on-site at the vendor's (in this case Buffalo Pumps') manufacturing facility, and the Machinery Inspectors under Naval Sea Systems Commands carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for Directors of the

Machinery and Propulsion Equipment Groups, who worked for me at times during my career, to inspect the manufacturing process at vendors' plants.

8. The Machinery Inspectors exercised primary, front-line control over the work performed for the Navy by vendors such as Buffalo Pumps in the production of pumps and other equipment. The Naval Machinery Inspectors were responsible for assuring that contractors such as Buffalo Pumps followed the required contract specifications as they relate to naval machinery. Further, the Naval Machinery Inspectors would report to their superiors any violations or failures to comply with specifications.

9. Specifications for Naval ships and their equipment require special characteristics necessary to satisfy reliability in combat situations and during long intervals at sea. Naval ships and equipment are maintained with parts from a naval supply system that provides spare parts and proven consumables aboard ship and at stock points in remote geographic locations. The problem of maintenance support is made more complex by the fact there are hundreds of naval ships. For these reasons the Navy cannot tolerate variations in its equipment or the parts and consumables associated with them. Any deviation from equipment military specifications requires specific written approval from the Navy. The Navy must know that the design and material that goes into its ships and equipment are in strict adherence to specifications – without this assurance we would not have a reliable and serviceable Navy.

10. Pumps built for Navy vessels, including Buffalo Pumps' pumps, were manufactured according to detailed specifications prepared, written and issued exclusively by, and plans approved by, the Navy, specifically NAVSEA or BUSHIPS. In my role as Chief Engineer and Deputy Commander for NAVSEA's Ship Design and Engineering Division, I was personally responsible to the Commander of NAVSEA for developing ship designs and for overall technical

support to the operating fleet, maintenance of ships, and ships under construction. I was also responsible for maintaining naval ship military specifications and for monitoring compliance with the specifications by all vendors and contractors of naval equipment.

    11. MilSpecs for pumps and other equipment intended for use aboard Navy vessels were drafted, approved and maintained by the Navy, specifically NAVSEA, to address all aspects of shipboard equipment and materials requirements, including the materials to be used. Any changes to these specifications were made by the Navy. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels. NAVSEA or BUSHIPS also prepared contract specifications which incorporated the MilSpecs. These specifications reflected the state of the art and the special needs of combat vessels destined for combat with our sailors. They were communciated to pump vendors such as Buffalo Pumps when the Navy issued Requests for Proposal for shipboard equipment. The specifications covered the nature of any communication affixed to pumps or other equipment supplied to the Navy.

    12. The Navy retained the final say over the design of any piece of equipment, and made the ultimate decision regarding how to resolve an engineering disagreement between the Navy and an outside supplier. Without prior discussion, approval and acceptance by the Navy, a warning related to asbestos hazards would not have been permitted.

    13. In addition to specifications regarding design and manufacturing of the equipment itself, the Navy also had detailed specifications that governed the form and content of written materials to be delivered with equipment, including pumps, supplied to the Navy. These written materials typically consisted of technical or instruction manuals that were designed to assist the Navy engineering staff in servicing and maintaining the equipment. Navy personnel participated

in and approved the preparation of this kind of information. The Navy specifications for these manuals contained detailed direction as to the kinds of information to be included.

14. I am familiar with the MilSpecs and other specifications governing the preparation of technical manuals for machinery and equipment supplied to the Navy. Exemplars of these specifications – 35B2(SHIPS) (15 Feb. 1949); MIL-T-15071B (16 Aug. 1954); and MIL-M-15071D(SHIPS) (6 June 1961) – are attached as Exhibits B, C and D. These specifications did not require manufacturers of Naval equipment, such as pumps, to include warnings pertaining to potential asbestos hazards. Indeed, for the reasons already discussed above, a manufacturer such as Buffalo Pumps would not have been permitted to include a warning regarding asbestos in an equipment manual or on a product label. The Navy's detailed specifications did not leave room for individual manufacturers to make determinations about the inclusion of a warning.

15. As a consequence of the foregoing, all equipment, including pumps supplied by Buffalo Pumps for use aboard Navy vessels were manufactured pursuant to Navy specifications under close supervision by personnel employed by the Navy, and approved for installation aboard these vessels exclusively by the Navy and its designated officers. Any warning purportedly required by state law would not have found its way into a ship as a permanent label on a pump or as a warning in accompanying written materials unless it had been required specifically in the specifications for the product that were issued by the Navy.

16. The Navy had state of the art knowledge regarding the potential risks associated with exposure to asbestos and asbestos-containing products. Acting with this knowledge about asbestos-related hazards, the Navy affirmatively addressed the issue of asbestos-related safety precautions. As noted above, the Navy established its MilSpecs to account for the safety precautions it deemed appropriate.

17. The Navy maintained a Medical Department, which had the mission of "promotion of physical fitness; prevention and control of diseases and injuries; and treatment and care of the sick and injured." As explained in *The Human Machine: Biological Science for the Armed Services*, a 1955 Naval Institute textbook that was incorporated into the curriculum during my time at the United States Naval Academy, "in order to fulfill [its] responsibility[,] the Medical Department is actively concerned with all phases of life in the Navy and advises all components of the Navy on matters which may affect the health and well-being of naval personnel." (Exhibit E, p. 275.)

18. The Navy Medical Department maintained a central administrative organization known as the Bureau of Medicine and Surgery ("BUMED"). Among BUMED's many functions was a responsibility to conduct research to "assist in the development of new equipment, new and better methods of care and treatment of various diseases and injuries; help in the problem of adjustment of naval personnel to all of the new and strange environmental situations in which they are placed; and, in general, provide the knowledge necessary for the more efficientoperation of the Navy. BUMED's research was "extremely broad and parallels the total activity of the Navy." (Exhibit E, p. 277.)

19. In dealing with asbestos, the Navy also conducted its own training, adopted its own precautionary measures and procedures and provided its own warnings where such warnings were deemed appropriate. For example, a 1950 General Safety Rules Manual issued by the Puget Sound Naval Shipyard instructed workers to "[w]ear dust type or air-fed respirators for . . . handling amosite [asbestos] insulating materials. . . ." (Exhibit F, p. 31.) A 1961 Marine Pipe Covering and Insulating Manual for Puget Sound similarly set forth "General Safety and Health Practices," including instructions to "[h]andle amosite . . . materials carefully to avoid [its]

dust[]," "sprinkle amosite with water whenever possible to keep dust down," and "[s]ee that your chest is X-rayed at least once a year to detect the possibility of . . . asbestosis." (Exhibit G, pp. 25-26.) Notably, the basic Naval Academy textbook *The Human Machine* referenced above discussed the fact that "[t]here are *dusts* and *vapors* which cause injury and occasionally death. For example, dust causes such diseases as silicosis, anthracosis, and other diseases due to the inhalation of such materials as asbestos dust, iron dust, tobacco dust, etc." (Exhibit E, pp. 85-86).

20. In November 1970, the Hygiene Division of the Medical Department at Puget Sound issued a manual pertaining specifically to "Asbestos Exposure and Control" (Exhibit H), which presented "Clinical & Environmental Findings" of a study done in connection with the shipyard's occupational health program, comparing the incidence of lung abnormalities across various occupation groups in the shipyard, and assessing the effectiveness of control measures used by the Navy. The manual also recommended control methods designed to reduce asbestos-related health hazards, including use of respirators and protective clothing, ventilation controls, substitution of asbestos-containing materials, changes in work practices (such as wetting of asbestos-containing materials during installation and removal), and implementation of education programs designed to reduce the incidence of asbestos-related illnesses.

21. In February 1971, NAVSHIPS issued Instruction 5100.26 (Exhibit I), providing a clear example of the Navy's having taken affirmative steps to implement a detailed and comprehensive plan for controlling asbestos hazards. This document set forth dozens of steps to be taken to reduce or eliminate exposure to asbestos from materials in use aboard Navy vessels and in other Navy facilities. Additional instructions were issued thereafter by various Navy

departments as the Navy continued to refine its procedures for handling of asbestos-containing materials and preventing asbestos exposures.

22. In my experience, and as evidenced by the documents described above, the Navy relied on training and procedures to protect its personnel against safety hazards such as asbestos. The Navy believed that excessive warnings for common shipboard hazards led to apathy and resulting disregard of hazard by Navy personnel. Thus, the Navy would not have permitted (either under the specifications or, as a matter of Navy practice) a vendor such as Buffalo Pumps to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos. Any attempt by a manufacturer to affix a cautionary statement concerning asbestos to pumps would have been futile, and would have been contrary to Navy protocols for instruction and training relating to use of asbestos materials.

23. The Navy's view that issues such as asbestos exposure were inappropriate subjects of warnings on pumps or in documentation relating to them is exemplified by the manner in which the Navy chose to handle the hazards of asbestos. Rather than placing warning labels on, for example, thousands of feet of piping hundreds of pieces of equipment, the Navy instituted procedures and training designed to educate its personnel in what the Navy determined to be appropriate work practices. Even in the case of insulation, the Navy did not place warnings on "packages."

_____
ROGER B. HORNE, JR.

Sworn to and subscribed
before me this 4 day
of August, 2010.

_____
NOTARY PUBLIC  E Marlene Mitchell

[Notary Seal: E MARLENE MITCHELL, NOTARY PUBLIC, STATE OF WASHINGTON, COMMISSION EXPIRES AUG. 31, 2013]