*Gale Lyautey and Patricia Lyautey v. Alfa Laval, Inc. et al.*,
Case No. 10-35086CA31, Circuit Court of the
11th Judicial Circuit in and for Miami-Dade County, Florida

### AFFIDAVIT OF SAMUEL A. FORMAN, M.D.

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS ) | |
| ) | ss. |
| COUNTY OF NORFOLK ) | |

I, Samuel A. Forman, M.D., being under penalty of perjury, declare and say:

1. I am a medical doctor specializing in preventive medicine and occupational medicine. I received a B.A. degree from the University of Pennsylvania majoring in history and biology, graduating *magna cum laude* in 1973. I attended Cornell Medical School, graduating with an M.D. degree in 1977. I also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, I became board certified in occupational medicine after attending a residency at the Harvard School of Public Health.

2. In 1977, I went on active duty in the United States Navy, and I performed my internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978. I remained on active duty in the Navy until 1983. Thereafter, I continued to work for the Navy as a civilian employee until 1986. My qualifications and credentials are more fully described in my curriculum vitae (Exhibit A).

3. While on active duty in the Navy, I ran an occupational health clinic at the Naval Weapons Station at Seal Beach, California, and assisted in the medical programs at the Long Beach Naval Shipyard. Among other responsibilities, I assisted in the asbestos medical surveillance program for over 2,000 federal Civil Service employees and uniformed sailors. At any one time, I was following 200 cases of asbestos disease.

4. In 1982, I was assigned to the Naval Environmental Health Center at Norfolk, Virginia. While stationed there, I designed occupational medicine programs with regard to Navy-specific occupational diseases, performed health hazard evaluations, inspected the occupational health programs of government facilities as part of the Navy Occupational Safety and Health, for "NAVOSH," program, carried out epidemiologic studies, and trained Navy doctors and nurses in occupational medicine.

5. In 1983, a Navy JAG officer for the Naval Medical Command requested that I become part of a team to locate, digest and organize government documents for production in asbestos litigation. Over the next year and a half, I investigated the Navy's historical handling and knowledge of various industrial hygiene issues, including asbestos disease.

6. In 1985, pursuant to Navy orders (Exhibit B), I completed my review of Navy knowledge and practice in industrial hygiene, including its awareness of and response to health hazards of asbestos, as a formal assignment. My search for documents took me to the National Archives, other warehouses and storage facilities for records of the Navy's Bureau of Medicine and Surgery. I was given full security clearances for and access to these facilities. I also conducted research at private facilities such as Harvard University's Countway Library of Medicine's section for rare books and manuscripts.

7. From my review of countless Navy documents and my studies while employed by the Navy, I acquired extensive knowledge as to the state of Navy knowledge and awareness regarding the hazards of asbestos.

8. Following my research, and with the approval of the U.S. Navy's Bureau of Medicine and Surgery, I published an article entitled "U.S. Navy Shipyard Occupational Medicine

Through World War II" in the *Journal of Occupational Medicine*, Vol. 30, No. 1 (Jan. 1988) (Exhibit C).

9. Though I no longer hold any formal position with the Navy, since I left I have been asked on a number of occasions to speak to Navy medical and safety personnel on issues relating to the history of occupational medicine and industrial hygiene in the Navy.

10. I am currently a Visiting Scientist in the Department of Environmental Health at the Harvard University School of Public Health.

11. The Navy has always taken responsibility for the health and safety of its uniformed and civilian personnel. It has consistently exercised its discretion regarding hazard recognition and appropriate controls in Navy workplaces. As Navy Captain Ernest W. Brown, M.D., recognized as the architect of the Navy's formal occupation health program prior to World War II, wrote in 1940: "One of the most important concerns of the Medical Department of the United States Navy today is industrial hygiene, especially in navy yard practice." (Exhibit D).

12. This commitment was reflected in numerous other Navy statements and documents. In 1943, Secretary of the Navy, Frank Knox, in a statement co-signed by the Chairman of the U.S. Maritime Commission, E. S. Lamb, stressed the Navy's commitment in this regard:

> The necessity for conserving manpower and promoting the physical welfare, health, and safety of what shortly will amount to one million workers in shipyards required that careful observance of standards for the prevention of accidents and protection of health be accorded. Aside from the weight which must be given humanitarian consideration, it is simply good common sense that as much care and attention be given to protecting the human factors in the war production program as is given machines.

"Minimum Requirements for Safety and Industrial Health in Contract Shipyards" (Exhibit E). Similarly, in a 1955 Naval Institute publication called *The Human Machine*, Captain Charles W. Shilling of the Navy Medical Corps described the "paramount importance" of Navy health: "[T]he medical component of the Navy has a heavy responsibility" with a mission to promote

3

physical fitness, prevent and control diseases and injuries and treat the sick and injured. (Exhibit F, p. 275).

    13. Consistent with the Navy's interpretation of the importance of industrial hygiene and occupational health, the Navy's programs in these areas have paralleled, and at times led, the development of occupational medicine and industrial hygiene in general, and asbestos-related issues in particular. The Navy's knowledge in the areas of asbestos and associated health conditions has been quite complete when compared to available knowledge over time, and at least by the early 1940s, the Navy had become a leader in the field of occupational medicine relating to, among other things, asbestos exposure.

    14. As early as 1922, the Navy recognized, as exemplified by its instructions to officers published in the Navy Medical Bulletin, the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure. These included the use of water to dampen dust, exhaust systems to remove dust, enclosed chambers to prevent escape of dust and respirators (Exhibit G). The Navy's knowledge of potential asbestos-related health problems, and of the means to control against them, continued to expand throughout the following decades, as senior Navy officers actively assessed, evaluated, controlled, and made recommendations concerning Navy policy regarding disease and injury prevention, including asbestos related occupational health hazards.

    15. The Navy's health and safety apparatus on the eve of World War II was described in the 1939 Handbook of the Navy Hospital Corps (Exhibit H) published by the Bureau of Medicine and Surgery under the direction of the Secretary of the Navy:

> The United State Navy is one of the largest of the industries maintained by this Government. An organization has been set up in the Navy to protect its personnel, both civilian and naval. A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy. He has supervision of the safety precautions taken to protect the

> civilian employees in the navy yards, ammunition depots, torpedo stations and the like. He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities. A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented. Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of the medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea. In each of these places a variety of health hazards exist. It is therefore necessary that this personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

(Exhibit H, p. 515).

16. The Handbook of the Navy Hospital Corps explained that all Navy yards have a commandant who "is responsible to the Navy Department for the protection of employees, as well as Navy personnel, under his command. He is familiar with . . . the health and accident hazards presented." Thus, the Commandant was "responsible for the appointment of the safety engineers [who will] make inspections and recommend proper protective measures." (Exhibit H, pp. 516-17). The Handbook further called for the Navy medical officer to "advise the safety engineer and instruct the employees in safety measures and encourage them to cooperate in protective measures." (Exhibit H, p. 517). These safety measures included required "masks for asbestos workers." (Exhibit H, p. 519).

17. Also in 1939, the Annual Report of the Surgeon General of the Navy addressed the "Hazard of Asbestos," and described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods." (Exhibit I). The Report noted the risk from "continued exposure to present occupational conditions" at Navy facilities, and directed

appropriate methods for preventing such exposures, recommending the use of local exhaust ventilation to control asbestos dust exposure for insulators in the fabrication shop.

18. At about the same time, Navy Captain E.W. Brown undertook an assessment of asbestos exposure, and its prevention, in Navy yards. In an article entitled "Industrial Hygiene and the Navy in National Defense" published in 1941 (Exhibit D), Captain Brown prescribed appropriate measures for the prevention of asbestos exposure. These included use of respirators, local exhaust ventilation, and wetting of asbestos containing materials.

19. The Navy has historically directed all aspects of policy and procedure addressing the health and safety of Navy personnel. This direction has encompassed policies, practices and procedures to protect workers from dangers posed by exposure to asbestos. Indeed, the Navy has on several occasions over time rejected offers of assistance from other leaders in the field.

20. For example, in 1941, the U.S. Labor Department's Bureau of Labor Standards offered to conduct inspections of health and safety conditions in Navy shipyards. Navy leaders rejected this offer. In a memorandum to Navy Surgeon General McIntire, Commander Charles S. Stephenson, head of the Division of Preventive Medicine within the Navy's Bureau of Medicine and Surgery, offered "[n]otes for consideration when you call on Assistant Secretary [of the Navy Ralph A.] Bard." (Exhibit J). Commander Stephenson advised Admiral McIntire that Assistant Secretary Bard:

> asks specifically what the policy is concerning invitation of…the Bureau of Labor Standards, Labor Department into the Navy Yards to make a survey of the welding and other hazards. I told him that we had never done that sort of work and recommended against it, as I know who [the Bureau of Labor Standards] intends to send if it should be done.

Navy leaders recognized that other government departments had a high level of expertise, while rejecting the offers of assistance:

> I gave Mr. Bard and the two officers present a complete story of the beginning of this controversy from the Federal Administrator's letter: that is, that the United States Public Health Service had four teams of traveling scientists alleged to be able to make surveys of all of the Navy Yards and make recommendations for the correction of such hazards as were discovered.

He then emphasized:

> I told Mr. Bard that this was not considered the best policy, due to the fact that we had medical officers in the Yards and that in practically all instances recommendations of sound character had been made by medical officers. We saw no need of inviting the United States Public Health Service on its own invitation to do this job.

(Exhibit J).

21. The Navy's reluctance to accept these offers of assistance was based on concerns regarding possible upset of labor relations, and also for security at Navy facilities. Stephenson's memorandum makes clear that these concerns originated at the highest levels of Government:

> Likewise, I told him that I had spoken to you and that you had indicated that President Roosevelt thought that this might not be the best policy, due to the fact that they might cause disturbance in the labor element.

(Exhibit J). (President Roosevelt was familiar with the structure and operation of the Navy's shipyards and other facilities – and in particular with the functioning of the Navy during wartime – from his tenure as Assistant Secretary of the Navy from 1913 until 1920. Admiral McIntyre was President Roosevelt's personal physician in addition to being the Surgeon General of the Navy.)

22. Stephenson's positions were taken even in light of knowledge that not all industrial hazards were adequately controlled at Navy facilities: "I doubt if any of our foundries would be tolerated if the State industrial health people were to make surveys of them." Asbestos, too, was discussed as an issue: "I am certain that we are not protecting the men as we should." (Exhibit J).

23. Health and safety issues, including those relating to asbestos exposure, continued to be a major focus of the Navy and the United States Maritime Commission, throughout World War II. In 1943, the Navy, along with the Maritime Commission declared its responsibility for the safety and health of their workers and took charge of implementing and staffing safety and health programs for those workers. Following extensive discussion with various constituencies, the Navy and the Maritime Commission jointly issued "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" (Exhibit E - "Minimum Requirements). The specific requirements imposed by the document enunciated for private and contract shipyards expectations that were already in effect and implemented at the Navy's own facilities.

24. The Minimum Requirements identified asbestos-related disease as a potential hazard of shipyard work, explaining that exposure could result from handling, sawing, cutting, molding and welding rod salvage around asbestos or asbestos mixtures. The document advised that such jobs "can be done safely with:

    1. Segregation of dusty work and,

    2. (a) Special ventilation: Hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or

       (b) Wearing of special respirators.

    3. Periodic medical examination."

(Exhibit E, 13.7(b)). The 1943 Minimum Requirements document also warns that jobs involving exposure to asbestos require "respiratory protective equipment," in particular a "dust respirator." (Exhibit E, 11.1). A ventilation supervisor (the safety engineer) was required to be trained to handle the entire ventilation program in the yard, which was to include classes, demonstrations and short talks on proper procedures. (Exhibit I, 14.3(b)).

25. The Minimum Requirements document further called for employee safety training: "the time for the safety training of an employee to start is at the inception of his employment." "Employees shall have in their possession, and be instructed in the proper use of, all necessary personal protective equipment before being started on any job." (Exhibit E, 6.2). Safety bulletin boards were to be located at each hull and shop, with "[s]afety posters and other material on the bulletin boards" changed at least semi-monthly. (Exhibit E, 6.6). The type of safety posters used in these worker educational campaigns included materials reinforcing the use of masks for protection against disease-causing dusts. One such poster stated, "His mask keeps him on the job." (Exhibit K).

26. This commitment by the Navy to address the asbestos-related health concerns of Navy workers, as set forth in the 1939 Handbook of the Hospital Corps and the Minimum Requirements document, is further evidenced by dozens of other documents generated by the Navy and consultants it retained during the war years.

27. Later in the war, following extensive study of asbestos-related health issues, Dr. Philip Drinker, a Harvard professor and Chief Health Consultant to the Division of Shipyard Labor Relations and consultant to the Navy Surgeon General since 1941, wrote on January 31, 1945 to Captain Thomas J. Carter at the Navy's Bureau of Medicine and Surgery (Exhibit L). In his letter, he reported on analyses of airborne dust collected at Bath Iron Works, a leading contractor for construction of Navy vessels. Dr. Drinker summarized the results of the analysis: "This evidence is enough to indicate a fairly serious dust risk at Bath and to make it very probable that the same sort of thing will be found in other plants and yards where the same type of [asbestos] pipe covering materials are used."

28. In addition to asbestos health concerns revealed at Bath Iron Works, experience in some of the contract shipyards also came to the attention of Dr. Drinker and Navy authorities. For example, union and worker complaints regarding asbestos-containing insulation at New York Shipbuilding led Dr. Drinker to meet with manufacturers of asbestos pipe insulating materials used by the Navy. Dr. Drinker recorded that "they would be glad to get out a brief statement of precautions which should be taken in the light of their own experience." (Exhibit L). However, Dr. Drinker wrote that he "underst[oo]d that neither Navy nor Maritime [Commission] wants any change in the specifications as the performance with the present materials is entirely satisfactory."

29. These sentiments reflect the Navy's commitment to maintaining complete control over existing military specifications, policies and procedures with respect to asbestos-containing materials and worker practices with those materials. Consistent with this episode, in my research, I have not located a single instance in which the Navy, at any time during the 1930s through the 1960s, instructed or permitted a supplier of pumps to a vessel or facility to affix or provide any asbestos-related warning with its equipment.

30. While rejecting the participation from manufacturers in the Navy's efforts to alert Navy personnel to potential asbestos hazards in Navy operations, the Navy pursued the issue in its own way:

> [Professor Drinker] suggested to Admiral Mills that it would be very desirable for Navy to examine men handling the preparation of [asbestos] pipe coverings and their installation in at least two Navy Yards and two Navy contract yards as this is much more a Navy than a Maritime problem because the materials are used especially on Navy vessels with high pressure steam power plants. Admiral Mills agreed that such studies would be wise before Navy or Maritime accepted this asbestos risk as being significant in our general ship construction program.

(Exhibit L).

31. Dr. Drinker and his Navy colleagues published the results of the study he had suggested in W.E. Fleischer, et al., "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels," 28 *Journal of Industrial Hygiene & Toxicology* 9-16 (Jan. 1946). The study reaffirmed the Navy's position regarding acceptable occupational dust exposure levels and dust control strategies. They offered the conclusion that "[asbestos] pipe covering is not a dangerous trade." (Exhibit M, p. 16).

32. The conclusions of this study were carried into practice in Navy workplaces following World War II. The January 1947 issue of the Navy's *Safety Review* publication noted that "[e]xposure to asbestos dust is a health hazard which cannot be overlooked in maintaining an effective industrial hygiene programs." (Exhibit N).

33. Also during the second half of the 1940s, the American Conference of Governmental Industrial Hygienists ("ACGIH") evaluated the issue of asbestos exposures. This entity, comprised entirely of industrial hygienists with links to the government and academia, published threshold limit values for acceptable exposures to asbestos dust in the workplace. These standards were periodically updated over the years. Representatives of the Navy, trained as industrial hygienists, participated in the ACGIH. In recognition of the potential hazards associated with exposure to asbestos dust, a 1955 Navy Bureau of Medicine instruction adopted the ACGIH's threshold limit value for exposure to asbestos dust among Navy personnel. (Exhibit O). The 1955 threshold limit value as promulgated in the Navy instruction was the same level to which the Navy had sought to control exposures during World War II.

34. During the 1950s, the Navy continued to prescribe safe work practices to address potential shipyard hazards associated with exposure to asbestos dust. In 1957, the Navy convened at the Boston Naval Shipyard a "Pipe and Copper Shop Master Mechanics'

11

Conference" to address issues of concerns to those in the pipefitters' trade. At the conference were personnel from all twelve Navy shipyards and the Navy's Bureau of Ships in Washington, D.C.

35. The prepared remarks of a Long Beach Naval Shipyard official, included in the Minutes of the Conference reflect the Navy's stated policy that pipe insulators and laggers who handle asbestos products should wear respirators:

> Asbestos, when handled dry, produces vast amounts of silica dust. . . . [T]he material can be dampened to reduce the amount of dust liberated. However, the specified type of amosite [asbestos] for use on cold water piping is water repellent. Also material which must be removed from an existing installation is dry and powdery, being an excellent dust producer. . . .
>
> [D]uring 1956 eleven deaths from asbestosis were reported on the Pacific Coast alone. . . .
>
> I know that two of my insulators are now afflicted with this condition. How many more will become afflicted is something which I hesitate to predict.
>
> Again the solution is obvious. Remove the cause by substituting other products. . .
>
> In the meantime, the answer is the wearing of respirators by all who handle asbestos products.

(Exhibit P).

36. A New York Naval Shipyard official added that if those working with asbestos insulation have not been "told . . . to put on masks, you are more or less the cause of their trouble." That same official added:

> I think everyone, who has people doing this type work, should warn their people regarding the handling of this material. With the proper handling of it on the job, and it has always posed a very big problem, because the men don't want to wear the masks, or get this dread disease. It is difficult to protect them. After a couple of years of mandatory wearing masks, I think they should realize the danger. I think everyone ought to enforce the wearing of masks. Don't forget this is something that injures people's health. We should do something about it – and fast, and I am convinced that what we are doing is not enough. We should not have people handle this material withou[t] protection.

(Exhibit P).

37. On January 7, 1958, the Department of the Navy issued a "Safety Handbook for Pipefitters," which explicitly addressed the asbestos hazard and again set forth Navy policy for controlling this hazard. This handbook – one of many safety handbooks issued by the Navy – stressed that "[a]sbestos dust is injurious if inhaled," and warned those working with asbestos insulation materials to "[w]ear an approved dust respirator for protection against this hazard." (Exhibit Q).

38. The early 1960s brought still further development of the Navy's policies and practices to protect workers from asbestos-related health concerns. Captain H.M. Robbins, a Navy physician, and W.T. Marr, a Navy industrial hygienist from the Long Beach Naval Shipyard, published the article entitled "Asbestosis" in the October 1962 issue of the Navy's internal *Safety Review* publication. The article addressed the potential for exposure to asbestos aboard ships:

> Aboard ship, a great variety of insulation is performed. Insulation blocks are shaped with a saw, pads are supplied to fittings, insulation cement is applied to blocks and covered with asbestos cloth. These and other operations take place in nearly all compartments; however, most work is done in the machinery spaces. By far the greatest potential exposure to asbestos fibers occurs during ripout of old insulation for ship overhaul or reconversions.

The article concluded that "[t]he worker's best protection is to avoid careless creation of dusty conditions, use damp material when possible, and wear respiratory protection constantly." (Exhibit R).

39. In 1968, the Navy came under scrutiny for its handling of asbestos-related health issues. On July 30, 1968, Murray C. Brown, Medical Director of the Public Health Service, wrote to Vice-Admiral R.B. Brown, the Chief of the Navy's Bureau of Medicine and Surgery,

13

stating that "[o]ne of our grantees, Dr. Irving Selikoff of New York University, has recently completed a study of non-insulation shipyard workers' exposure to asbestos," and that "Dr. Selikoff reports he has some interesting data and has requested that we arrange an information meeting with your Department and the U.S. Department of Labor to discuss his findings." (Exhibit S). On December 5 of that same year, Admiral Brown reported to others in the Navy health establishment that "Doctor I.J. Selikoff of Mount Sinai Hospital, through the news media, stated that he has warned the Navy and other Federal departments of his findings relating to the unusual incidence of asbestosis among shipyard asbestos workers. The newspaper articles stated that the Federal agencies including the Navy have not publicized the hazards." (Exhibit T).

40. In a "Hazard Analysis" commissioned in response to this external criticism of the Navy's safety practices, Commander Rosenwinkel of the Navy's Bureau of Medicine assured that:

> [T]he Navy's shipyards have for many years been aware of the hazards of asbestos and have initiated appropriate safety precautions. Insofar as possible, all fabrication work [with insulation] is performed in the shops where adequate safety precautions can be observed. These precautions include controlled ventilation, use of respirators, and wetting down of the material. During "rip out" operations, respirators are worn and ventilation is controlled as far as possible.

(Exhibit U). Similar language was prepared "for inclusion in a statement to be issued by Rear Admiral J.J. Stilwell, Shipyard Management Directorate":

> The United States Navy is well aware of the hazards of asbestos to its employees engaged in ship construction and ship repair at naval shipyards. Hazard control measures implemented by the shipyard medical departments and practices in the United States. Stringent efforts are directed at keeping the concentration of air borne asbestos dust below the level recommended by the American Conference of Governmental Industrial Hygienists. An energetic periodic physical examination program insures the health of personnel exposed to this hazard.
>
> For more than two years, the Naval Ship Systems Command and the Commander of Boston Naval Shipyard have been cooperating with a prominent investigator in a study whose ultimate goal is to define safe working conditions with respect to air borne

  asbestos. Upon the development of further objective, well founded recommendations for the control of this hazard, the Naval Ship Systems Command, in cooperation with the Bureau of Medicine and Surgery, will take the necessary steps to implement them at the naval shipyards and all naval activities.

(Exhibit V). The message was clear, and consistent: the Navy would handle asbestos issues in its own way and through its own channels.

  41. The development of the Navy's policy towards asbestos-related health issues, and of its program for addressing asbestos exposure to Navy personnel, continued into the 1970s. On February 9, 1971, the Commander of the Navy's Ship Systems Command issued to numerous Navy bureaus and commands its Instruction 5100.26 (Exhibit W). That document began by recognizing that:

> [t]he most critical use of asbestos in the Navy from a safety viewpoint is in the fabrication, installation, repair or removal of pipe and boiler insulation materials. Some workers sustain accidental contacts either while employed in various capacities where asbestos products are processed or when working in plant areas in which an environmental pollution of the air exists due to asbestos.

In light of these concerns, the purpose of the document was "to prescribe appropriate safety precautions during the use of asbestos," and it decreed that:

> [t]he following safety precautions will be observed by all supervisors and workers engaged in the fabrication, installation and/or removal (ripout) of asbestos-containing insulation material. The provisions of this instruction will be effective as of this date. The provisions in this instruction are considered as minimum health and safety requirements. More stringent restrictions may be applied by local commanders.

(Exhibit W). The document then listed nearly fifty specific work practices to be employed to protect workers from asbestos exposure in handling or working in the vicinity of asbestos-containing products.

  42. The Navy made its decisions with respect to the use of asbestos in accordance with Navy operating requirements and in furtherance of Navy missions, and in light of the Navy's knowledge of associated health hazards at the time and of its perception of the requirements of

federal law. The Navy's extensive and evolving knowledge of the hazards of exposure to asbestos and the means to control those hazards were weighed by the Navy against the benefits provided by its use. These benefits included meeting national defense needs in a standardized, efficient and low-cost manner that would not delay or hinder ship availability, especially during times of war. The Navy was informed in this decision-making by close contacts and liaison with relevant academic communities, professional organizations and other government agencies.

43. Similarly, the Navy's handling of and programs regarding workplace safety and hazard communication, as they related to asbestos and other issues, reflected the Navy's balance of various considerations, including combat readiness, maintenance of the necessary command structure, the needs of discipline and the hierarchy of risks presented by life and work aboard a combat vessel. In general, the Navy chose to address long-term workplace health issues in the course of training for various trades and jobs, rather than using labeling or other written materials to accompany products into the workplace.

44. During the time periods in question, the Navy's occupational health program in no way depended upon, required or sought advice from equipment manufacturers regarding long-term occupational health issues, including those posed by exposure to asbestos dust. I have not uncovered – nor would I have expected to based on my research and experience and the extent of the Navy's knowledge in these areas – situations in which the Navy solicited from suppliers of shipboard equipment any information or guidance regarding the appropriate methods for the prevention of exposure to asbestos. Given the Navy's state-of-the-art knowledge concerning asbestos related hazards and its robust safety and health program, it would be unreasonable to assume that the Navy would have accepted any advice pertaining to asbestos related safety precautions from a manufacturer of equipment.

45. My opinions set forth herein are held to a reasonable degree of scientific certainty.

_____
Samuel A. Forman, M.D.

Sworn to and subscribed
before me this __6TH__ day
of August, 2010.

_____
NOTARY PUBLIC

NADYA N. FITISENKO
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
October 15, 2015