

UNITED STATES NAVY DEPARTMENT
BUREAU OF MEDICINE AND SURGERY

# ANNUAL REPORT OF THE SURGEON GENERAL, U. S. NAVY

CHIEF OF THE BUREAU OF MEDICINE AND SURGERY

TO THE SECRETARY OF THE NAVY

CONCERNING

STATISTICS OF DISEASES AND INJURIES IN THE UNITED STATES NAVY

FOR THE CALENDAR YEAR

1939

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1941

ious action of the light.

## INDUSTRIAL MEDICINE

Navy Yard, Charleston, S. C.--In order that claims for industrial injury may be confined to those receiving such injury by reason of their employment in the navy yard, all applicants for trades listed as potentially hazardous, receive a special examination, including X-ray examination of chest, where necessary, prior to their employment or assignment to the hazardous occupation. In addition to the entrance examination, periodical examinations are given during continuance of occupation in such work. This increases the work of the Yard dispensary and involves considerable additional cost to the government by reason of materials expended, but it is believed that the results obtained will prevent any serious industrial injury to the man occupied in hazardous industrial trades and prevent unjust compensation claims to be filed against the Government. As a means of protection to fellow employees and to prevent unjust claims to compensation for injuries alleged to have been received by reason of industrial employment, it is recommended that as a condition of employment all Civil Service applicants be required to have a serological test, with the provision that applicants who show a positive serological reaction but no active lesions, shall be required to have continuous medical treatment until negative serological tests are obtained or the disease is pronounced non-infectious by the Yard medical officer. It is also recommended that where infection occurs subsequent to employment that serological tests be made compulsory. As condition of employment, large private industrial corporations require serological tests prior to employment and at periodic intervals thereafter. If it is found that employees have active syphilitic disease, medical treatment is compulsory unless they are pronounced non-infectious by the company physician. Medical treatment for Civil Service employees could be obtained from private physicians or public clinics, and such treatment could be evidenced by certificates signed by licensed practitioners, but serological examinations should be performed at the Yard dispensary in order that a uniform procedure may be followed.

Puget Sound Navy Yard, Bremerton, Wash.--The average employee of this Navy Yard is safety-minded, and a general spirit of cooperation with regard to accident prevention continues. The safety program has been carried forward with excellent results during the past year, emphasis being placed on education of men through indoctrination of the supervisors. Analysis of representative periods have shown that approximately 90 percent of all accidents are directly attributable to carelessness of the men. The record of 18 lost-time accidents among 5,985 employees as compared with 22 lost-time accidents among 4,022 employees in 1938 is considered very satisfactory.

During the past year the following additional safety measures have been undertaken: (a) a new type of face shield has been obtained for buffing and polishing work which is a great improvement over goggles; (b) new double lenses for helmets have been obtained which are found to be much more satisfactory than the old; (c) salt tablet dispensers have been installed in all shops in which "hot work" is carried on; (d) ventilation of shops and offices has been materially improved, and is continuing to improve as funds become available for projected work; (e) an investigation has shown that men on machine tool work wearing corrective spectacles have only one-eighth the number of [illegible] particle eye injuries as compared to men wearing no specta[illegible]. Cr[illegible]

[illegible]ary cup goggles are unsuitable for most types of machine tool work [illegible] to restricted vision. It has been proposed to the Navy Department [S]afety Engineer that a suitable type of spectacle goggle without side [illegible] be approved for use on these types of machine tool work; and (f) [th]e present Navy specification welding glove has been found to be unsatisfactory, particularly for overhead electric welding. A number of [illegible] have been burned due to failure of exposed stitching in this glove. [It] has been proposed that a more suitable type of glove be approved.

The number of eye injuries among the regular Yard employees was [mo]re than double for the calendar year 1938 - 223 for 1938 and 457 for [1]939. The increased number of employees can account for some of the [in]crease but the eye injuries have increased out of proportion. Out[sta]nding causes of injuries to the eyes have been poor fitting goggles [an]d failure to use goggles in spite of educational activities on the part [o]f the medical department, injury officer, and supervisors. It is grat[ify]ing to note that there were no lost-time eye injuries among the reg[ul]ar Yard force and only one case among the relief workers.

Statistics show a definite increase in all types of injuries among [cl]asses of employees except the Emergency Relief, Navy. This in[c]rease is out of proportion to the increased personnel and it is be[liev]ed to be due to the fact that the shop superintendents insist that [e]mployees receiving injuries, no matter how slight or insignificant [the]y may seem in extent or severity, report to the Dispensary for [tr]eatment. This opinion is supported by the reduction in the actual [nu]mber of "Injuries resulting in Loss of Time" from 22 during 1938 [t]o 18 during 1939.

Navy Yard, New York, N. Y.--Welding: There are approximately [4]50 electric welders and 112 gas welders carried on the rolls.

It is well recognized that in the absence of protective measures or [w]ith inadequate measures welding incurs certain health hazards, such [a]s toxic gases from the arc of the flame, fumes or dust of metallic [o]xides of an injurious nature from the coating of certain welding rods, [d]amage to the eyes from ultraviolet rays, etc. The question arises [w]hether or not control protective methods now provided are entirely [ad]equate to prevent occupational diseases in welders under all cir[cu]mstances.

It was recommended to the Commandant in December 1939, at the [su]ggestion of the Director of the Division of Industrial Hygiene, New [Y]ork State Department of Labor, that a joint health study of the 930 [el]ectric, gas, and tack welders, be conducted by the latter agency and [th]e medical officer of the Yard. The proposed research contemplated [m]edical and occupational histories, physical examinations, and X-ray [st]udies, the funds and bulk of the research staff to be supplied by the [N]ew York State Division of Industrial Hygiene.

It was believed that such a study would yield results of great bene[fi]t to the workers and that the findings would be significant as a check [u]pon the present methods of control and of value to the U. S. Em[p]loyees Compensation Commission in relation to certain possible fu[tu]re compensation claims. Other outstanding authorities in industrial [h]ygiene were consulted and all concurred in the view that a large-scale [h]ealth study of welders was required to settle definitely certain ques[ti]ons relative to hazards of the occupation.

Lead and Lead Compounds: There is little hazard incident to brush [pa]inting in this Yard. Lead paint is used chiefly for the red lead [p]riming coat for the hulls of ships. Zinc, titanium or aluminum paints [a]re largely used for other applications. The enamel pai[nts] consist of a [illegible] base in varnish and turpentine. No cases of lead [pois]oning have [co]me to the attention of the Medical Department during the period un-

der consideration. Metallic lead is handled in the molten state as a component of Babbitt metal in the Inside Machine Shop (No. 31). This metal contains lead, antimony, and copper. The lead volatilizes at a relatively low temperature. The melting kettles are equipped with a hood connected to an air exhaust system with suitable suction fan pipe and conduit to remove fumes which form on the surface of the molten metal. In addition, a respirator is provided for protection against the inhalation of fumes.

Lacquer painting with spray technique is conducted with lacquers made up of a celluloid base with certain volatile solvents, some fast and some slow drying, which may lead to toxic symptoms if inhaled beyond threshold concentrations.

The Ordnance Machine Shop, Electrical Shop, and Sheet Metal Shop are equipped with hoods connected to adequate exhaust systems. In the Ordnance Machine and Sheet Metal Shops a water spray curtain is also provided for more effective removal of fumes. The spray room of the paint shop is not equipped with a hood, dependence being placed upon an exhaust blower for removal of fumes. This lack of localized exhaust results in a much slower rate of removal of contaminated air. No cases of volatile solvent poisoning were reported during the calendar year.

It is recommended that all spray painters be given an annual examination for evidence of toxic effects of volatile solvents.

Industrial Protection Against X-ray and Radium: (a) X-ray protection.--The Pipefitter Shop is equipped with one portable X-ray machine of 220 kilovolts and 25 milliamperes capacity which was installed approximately two years ago. This is employed chiefly for the detection of flaws in pipe-welded joints for high steam pressure installation. The maximum number of exposures approximates a total of 51 minutes a day. (1) Engineering Control: The X-ray tube is encased in lead of 2mm. thickness. The machine is contained in an enclosure 20 feet by 20 feet bounded by a shield 6-1/2 feet high, 10 feet from the tube in all directions and lined with sheet lead 2mm. thickness on three sides. (2) Medical Control: Four men are assigned as operators of the X-ray and radium installations. One of the earliest effects of radiation exposure is a destructive action on the white and red cells of the blood, more marked on the white cells in the early stages. A procedure has been established for a quarterly blood examination of operating personnel and an examination for possible general radiation injury.

(b) Radium Protection.--The use of radium was initiated 4 to 5 years ago for the detection of flaws in castings constructed for high pressure steam installations, both steel and non-ferrous. A capsule containing 278 mgms. of radium is the source of the radiation, the tests being conducted in the Inside Machine Shop. This is in use for an average of 150 to 200 hours a month. The chief metallurgist reports that high speed films exposed at a distance of 12 feet from the capsule for one hour showed no fogging. It is therefore concluded that employees are not subject to harmful radiation at that distance. Protective measures appear adequate.

It is emphasized that a thorough physical examination of a radium or X-ray worker shall be made before he is employed and at any time that the blood count shows suggestive changes or the worker complains of an obscure ailment. The question arises whether the foregoing measures of protection against X-ray radiation are entirely adequate. The situation was recently discussed with the Chairman of the Advisory Committee on X-ray Protection of the Bureau of Standards. [illegible] gested that personnel within the distance of 40 feet external of [illegible] ...ead [illegible]

workers would probably not receive a damaging exposure, the question of such a possibility demands consideration. The absolute necessity for further protection can be definitely determined by actual measurements of scattered radiation by means of the portable ionization chamber. It is recommended that the advisability of such tests be considered.

Precautions Relative to Pickling of Metals: (a) Building Ways, No. 1.--There are two sets of pickling tanks in this area, one for flat steel and one for piping. The acid employed is dilute sulphuric. The question at issue is whether at any stage of operation personnel are subjected to the inhalation of arsine gas or arsenic dust originating as a result of contact with arsenic, present as an impurity of the metal, with nascent hydrogen in the bath. Such a possibility appears extremely remote in view of the fact that the operations are conducted in the open air thus excluding the possibility of rising accumulation of arsenical compounds which might result in an enclosed space. However, it is advisable that the operating personnel be examined semi-annually for possible evidence of arsenic absorption instead of the quarterly examination now prescribed.

(b) Coppersmith Shop.--Both sulphuric and muriatic acids are used in the vats of this enclosed space connected with the coppersmith shop. The possibility of arsenical exposure discussed above also obtains for this space. Forced exhaust ventilation is provided and appears adequate. A semi-annual medical examination of operating personnel is advisable.

Occupational Dust Hazards: (a) The Steel and Brass Foundries.--The chief hazard to be considered is silicosis due to the inhalation of silica dust, the extent of the hazard being dependent upon the concentration, size of the particles, percentage of free silica, and the duration of exposure. Whether or not a silicosis hazard exists in these foundries can only be determined by actual counts of dust particles concentration under the various working conditions and the estimation of free silica in the sand used. It has recently been reported by the New York State Department of Labor that silicosis can be prevented if the average plant concentration does not exceed 15 million parts per cubic foot.

(b) Casting Cleaning Shop.--The conditions in this shop appear to be particularly unfavorable. The iron and brass foundry buildings are equipped with forced exhaust ventilation although its efficiency in controlling dust concentrations is undetermined. The casting cleaning shop, however, is not provided with any mechanical ventilation, dependence being placed mainly on roof cowls, which, it is believed, are inadequate.

Certain of the grinding and chipping operations should be conducted under hoods with localized suction ventilation. Two high-speed emery wheels and two carborundum grinding wheels are not equipped with suction ventilation. It is recommended that consideration be given to a systematic engineering survey of both foundries and the casting cleaning shop to include dust counts and the measures necessary to reduce silicosis hazards.

There are 33 employees in the iron foundry, 64 in the brass foundry, and 22 in the casting cleaning shop. It would be desirable to carry out a medical survey, including X-ray of the lungs, of all personnel in order to determine the incidence of silicosis. For the present, however, it is suggested that such a study be limited to employees in the casting cleaning shop where the worst conditions prevail

All candidates for employment for foundry oper[illegible]s should be given an X-ray examination of the lungs in order to scr[illegible] out cases in,

any state of silicosis.

(c) Sandblasters.--The present practice of an annual X-ray examination of the chest, or oftener if so indicated, will be continued.

(d) Hazard of Buffing and Polishing.--The possible hazard incident to dust from artificial abrasives such as carborundum, alundum, and emery should be considered. The dust from these materials does not contain free silica and therefore will not produce silicosis. However, if breathed for protracted periods, these dusts induce an X-ray appearance similar to that of early silicosis. This picture changes very slightly as length of exposure increases. There is clinical evidence, however, that workers exposed to heavy concentrations of abrasive dust are more susceptible to diseases of the chest than those not so exposed. Authorities in this field advise that an effort should be made to keep the dust count below 20 million particles per cubic foot. The dust is approximately 50 percent abrasive and 50 percent metallic. Although respirators are provided for individual use, it is impracticable to wear such a device constantly.

The buffing and polishing wheels in the Sheet Metal Shop are not equipped with localized exhaust. This is recommended as a safety precaution.

The grinding wheels in the tool room of the Shipfitter Shop are provided with either individual exhaust or are kept constantly wet which reduces to a marked degree the quantity of escaping dust.

Hazard of Asbestosis: Asbestosis is an industrial disease of the lungs incident to the inhalation of asbestos dust for prolonged periods, and is distinct from silicosis. The development of the disease depends upon the concentration of the dust, the size of the dust particles, and the length of exposure. The workers in the Pipe Covering and Insulating Shop are exposed to the inhalation of asbestos dust incident to the cutting of asbestos insulating felt in the fabrication of covers for flanges, valve bonnets, and high temperature steam turbines. The material falls under the trade name of "Amosite."

A medical survey of the 11 employees in this Shop was conducted recently with the object of ascertaining whether asbestosis in any stage could be detected. The history of exposure varied from 1,7 to 17 years, 6 men reporting 10 years or over. Present and past disability attributable to asbestosis was denied by all the men and X-rays of the chest were essentially negative in all cases. However, it was not considered that the negative findings precluded the future development of asbestosis by continued exposure to present occupational conditions. The following recommendation made jointly by the medical officer of the Yard and the safety engineer was approved: Install an exhaust blower over work table in the Pipe Covering and Insulating Shop to remove asbestos dust at the source as a protective measure against the hazard of asbestosis.

Norfolk Navy Yard, Portsmouth, Va.--Considerable work has been accomplished in industrial medicine. The medical officer, safety engineer, and W. P. A. Safety Supervisor work in close consultation. In this manner the medical and technical aspects of each industrial problem is properly coordinated. The Bureau of Medicine and Surgery and the Navy Department Safety Engineer have been consulted on several occasions and have given valuable suggestions.

A special effort has been made to collect literature and data with regard to industrial medicine to be used for reference purposes. Special attention is given to the working conditions in hazardous occupations such as sand-blasting, asbestos pipe-covering, amosite [illegible] fiber-glass insulation. Ventilation, clothing, masks, etc. are cl[illegible] [illegible]ed frequently. Routine inspections have revealed that helmets used [illegible]

blasting are of various types. A special study is being attempted with regard to types of masks, helmets, and respirators with the idea of recommending standard items of as near one type as possible.

An extensive study of a new insulating material, fiber-glass, now employed by the Navy, has recently been carried out by this department. Representatives of the manufacturers of this product have been interviewed, and numerous reports of clinical and laboratory investigations have been reviewed. The representatives claim that no harmful effects from the material have been noted among their employees over a period of 6 years, and the only precautions used are loose clothing and a good cleansing shower at the end of each working day. The evidence submitted is not entirely convincing, and the period of time since the introduction of the product is too short to warrant any definite conclusions at present. Until further information is available the following precautions are in effect: The employee must wear hood, respirator, and gloves at all times; the clothing must be loose and cover the arms and neck; goggles must be worn if there is excessive circulation in the compartment; and showers are required before lunch and at the close of the day.

At present the Norfolk Navy Yard has no instruments for making dust counts. The acquisition of at least one of the new and recently improved instruments would be a great advancement in the field of industrial medicine at this Navy Yard and would afford an opportunity for considerable research.

The hazards to civil employees consequent to industrial activity is a problem and requires continued, intense, effort and research with regard to personnel, new materials, new machinery, and new processes. Safety devices and rules should maintain a high standard. This aspect should be studied, developed, and mastered. It requires cooperation in safety engineering and intensive study of industrial health problems.

Naval Torpedo Station, Newport, R. I.--The number of infections following injuries remains low among civil employees at this station. This is due no doubt to the cooperation of all concerned in routing injuries, no matter how trivial, to the dispensary, where they are promptly treated. A follow-up system is also used whereby cases must report for daily observation and redressings until discharged. Many cases of colds, grippe, and bronchitis have developed among the civilian employees during the fall and winter months. By treating these cases three times daily with antiseptic sprays, cough mixtures, and cold capsules, and the prompt checking out of cases with elevated temperatures, an appreciable decline in lost-time incidence has been noted. It is encouraging to note that accidents are on the decline in spite of the increase in employees. By comparative classification we find that in 1935 there were about 4,962 injuries among 2,493 employees and in 1939 about 3,500 injuries among 3,852 employees.

A general physical examination of all workers in explosive materials, including a complete blood analysis and urinalysis, has been done monthly since October, 1939. An effort is being made to prevent occupational poisonings, with particular reference to tetryl and fulminate of mercury. To date no statistical data have been completed. Sand-blasters are examined routinely each month, and routine chest X-rays are done every three months, oftener if thought necessary.

Diseases of Class XV, by occupational groups, new admissions, 1939

| Occupational group | Psychoneuroses (all)* — Order of frequency | Psychoneuroses (all)* — Rate per 100,000 | Constitutional psychopathic inferiority, without psychosis — Order of frequency | Constitutional psychopathic inferiority, without psychosis — Rate per 100,000 | Constitutional psychopathic state, etc., (all)* — Order of frequency | Constitutional psychopathic state, etc., (all)* — Rate per 100,000 | Dementia praecox — Order of frequency | Dementia praecox — Rate per 100,000 | Psychosis intoxication, alcoholic — Order of frequency | Psychosis intoxication, alcoholic — Rate per 100,000 | Psychosis, unclassified — Order of frequency | Psychosis, unclassified — Rate per 100,000 | Psychosis, manic depressive** — Order of frequency | Psychosis, manic depressive** — Rate per 100,000 | Miscellaneous — Order of frequency | Miscellaneous — Rate per 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

*Includes "Emotional instability" ... [illegible]
**Includes "Hypochondriasis" [illegible]

RESPIRATORY SYSTEM

There were 318 original admissions and 20,719 sick days for diseases in this class during the year 1939, accounting for 0.52 percent of all admissions and 1.72 percent of total sick days.

In addition, there were 54 admissions for complications of other diseases or conditions, 21 admissions reported as existing prior to enlistment, 74 readmissions, and 47 cases remaining from the previous year.

Four of the diagnoses in Class XVIII (chronic bronchitis, asthma, acute fibrinous pleurisy, and sero-fibrinous pleurisy) caused 75 percent of class admissions and 68 percent of class sick days.

The common acute infectious diseases of the respiratory tract, colds, acute bronchitis, etc., as well as pneumonia, are classified as "Communicable diseases transmissible by oral and nasal discharges," and certain other diseases that might be thought of as diseases of the respiratory system, are accounted for in Class V, "Diseases of ear, nose, and throat." Class XVIII, therefore, does not account for a great number of admissions to the sick list.

Diseases in this class causing more than 10 admissions, together with a total for those diseases in the class causing less than 10 admissions, are listed in the following table:

Diseases of Class XVIII, admissions and sick days, 1939

| Disease | New admissions | Admission rate per 100,000 | Sick days per case |
|---|---|---|---|
| Bronchitis, chronic | [illegible] | [illegible] | 22.1 |
| Asthma | [illegible] | [illegible] | [illegible] |
| Pleurisy, fibrinous, acute | [illegible] | [illegible] | [illegible] |
| Pleurisy, serofibrinous | [illegible] | [illegible] | [illegible] |
| Pneumonitis, acute | [illegible] | [illegible] | 37.9 |
| Total for diseases in the class causing less than 10 admissions | [illegible] | [illegible] | [illegible] |
| Total for entire class | [illegible] | [illegible] | [illegible] |

Diseases of Class XVIII, with complications, 1939

| Disease | Number class admissions | Complication | Cases | Percent |
|---|---|---|---|---|
| Bronchitis, chronic | 91 | Pleurisy, serofibrinous | 1 | 1.10 |
| Asthma | 69 | Poisoning, ... acute, bichloride of mercury | 1 | 1.45 |
| Pleurisy, fibrinous, acute | 53 | Pleurisy, fibrinous, chronic | 4 | 7.55 |
| | | Pneumonitis, acute | 1 | 1.89 |
| | | Pneumonia, lobar, Type VIII | 1 | 1.89 |
| | | Pyelonephritis | 1 | 1.89 |
| Pleurisy, serofibrinous | 53 | Pleurisy, suppurative | 3 | 5.66 |
| | | Pleurisy, fibrinous, chronic | 1 | 1.89 |
| Pneumonitis, acute | 30 | Pneumonitis, chronic, nontuberculous | 1 | 3.33 |
| Pleurisy, fibrinous, chronic | 15 | Bronchiectasis | 1 | 6.67 |
| Pleurisy, suppurative | 11 | Abscess, brain | 2 | 18.18 |
| | | Pleurisy, fibrinous, chronic | 1 | 9.09 |
| | | Fistula, thoraco-axillary | 1 | 9.09 |
| Pneumothorax | 10 | Pleurisy, fibrinous, chronic | 1 | 10.00 |
| | | Pleurisy, serofibrinous | 1 | 10.00 |
| Pneumonitis, chronic, nontuberculous | 6 | Pneumonia, chronic, interstitial | 1 | 16.67 |



Diseases of Class XVIII, classified personnel, admissions by age group, 1939

| Age group | Officers, Navy and Marine: Number in group | New admissions | Rate per 1,000 | Enlisted men, Navy: Number in group | New admissions | Rate per 1,000 | Enlisted men, Marine: Number in group | New admissions | Rate per 1,000 |
|---|---|---|---|---|---|---|---|---|---|
| 15 to 19 | 0 | 0 | 0 | 11,810 | 30 | 2.64 | 3,802 | 3 | 0.78 |
| 20 to 24 | 1,13[illegible] | 1 | 0.88 | 50,1[illegible] | [illegible] | 1.87 | [illegible] | 12 | 2.76 |
| 25 to 29 | [illegible] | 10 | 4.17 | [illegible] | [illegible] | 1.73 | 2,813 | 6 | 2.12 |
| 30 to 34 | [illegible] | 3 | 1.36 | 14,[illegible] | [illegible] | 1.81 | 1,860 | 4 | 2.15 |
| 35 to 39 | [illegible] | [illegible] | 2.53 | 11,378 | [illegible] | 1.85 | 1,[illegible] | 3 | 1.40 |
| 40 to 44 | 1,[illegible] | [illegible] | 3.10 | 2,[illegible] | 8 | 2.74 | [illegible] | [illegible] | 3.78 |
| 45 to 49 | 1,104 | [illegible] | 4.52 | [illegible] | [illegible] | 8.63 | [illegible] | [illegible] | 7.46 |
| 50 to 54 | 1,[illegible] | [illegible] | 1.85 | [illegible] | [illegible] | 6.17 | [illegible] | 0 | 0 |
| 55 to 59 | 548 | 0 | 0 | [illegible] | 0 | 0 | [illegible] | 1 | 43.48 |
| 60 to 64 | 153 | 1 | 6.48 | [illegible] | 0 | 0 | 3 | 0 | 0 |
| 65 and over | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| All ages | 13,[illegible] | 36 | 2.64 | 114,447 | 232 | 2.03 | 18,981 | 44 | 2.3[illegible] |

## CIRCULATORY SYSTEM.

Diseases in this class were responsible for 562 original admissions and 40,522 sick days, or 0.92 percent of all admissions and 3.37 percent of total sick days. The admission rate was 376 per 100,000, as compared with 326, the admission rate in 1938, and 356, the median for the 9 preceding years.

Five of the diagnoses in the class (arterial hypertension; varicose veins; thrombosis, coronary artery; phlebitis; and chronic myocarditis) caused 61 percent of class admissions and 63 percent of class sick days.

In addition to the 562 original admissions shown in the table below, there were 51 admissions covering cases reported as complications of other diseases and conditions, 116 readmissions, 85 for diseases reported as existing prior to enlistment, and 107 cases remaining from the previous year.

Thirty-five of the 105 persons invalided from the service on account of diseases in this class incurred the disability prior to entering the service.

Diseases for which 10 or more admissions were recorded during the year and a total for those diseases in the class causing less than 10 admissions are shown in the following table:

Diseases of Class II, admissions and sick days, 1939

| Disease | New admissions | Admission rate per 100,000 | Sick days per case |
|---|---|---|---|
| Hypertension, arterial | 182 | 186 | 44.7 |
| Varicose veins | 79 | 53 | 29.0 |
| Thrombosis, coronary artery | 38 | 25 | 78.7 |
| Phlebitis | 32 | 21 | 42.0 |
| Myocarditis, chronic | 30 | 20 | 50.4 |
| Cardiac arrythmia, premature contractions | 23 | 15 | 40.3 |
| Syncope | 21 | 14 | 30.8 |
| Epistaxis | 17 | 11 | 6.8 |
| Arteriosclerosis, general | 16 | 11 | 48.1 |
| Tachycardia | 16 | 11 | 31.8 |
| Coronary heart disease, arteriosclerotic | 13 | 9 | 50.3 |
| Angioneurotic edema | 12 | 8 | 19.8 |
| Cardiac disorder, functional | 12 | 8 | 30.1 |
| Cardiac arrythmia, paroxysmal tachycardia | 10 | 7 | 28.3 |
| Total for diseases in the class causing less than 10 admissions | 81 | 54 | 52.1 |
| Total for entire class | 562 | 376 | 44.0 |

Dea
eases o

Diseа
circulato
being as



UNITED STATES NAVY DEPARTMENT
BUREAU OF MEDICINE AND SURGERY

# ANNUAL REPORT OF THE SURGEON GENERAL, U.S. NAVY

CHIEF OF THE BUREAU OF MEDICINE AND SURGERY

TO THE SECRETARY OF THE NAVY

CONCERNING

## STATISTICS OF DISEASES AND INJURIES IN THE UNITED STATES NAVY

FOR THE CALENDAR YEAR

1941

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON · 1944

and reclaiming unit. The decrease in the concentration of dust has been of primary importance from the health standpoint. Other advantages are a decrease in operating cost because of ability to reclaim some 75 percent of the sand and water, decrease in time needed for cleaning castings, better quality of the finished job, and elimination of pickling process to get rid of last traces of sand.

*Navy Yard, New York, N. Y.*—Experience indicates that individuals of the type to apply for employment through the Labor Board have an incidence of active pulmonary tuberculosis of about 2 percent. In most cases, the disease cannot be detected by ordinary physical examination. Consideration is at present being given to the practicability of including a chest x-ray as part of the preemployment examination.

The urgent demand for personnel, particularly in some of the skilled trades, has led to a lowering of the physical standards set forth by the Civil Service Commission in a number of occupational classifications. Up to the present time, there has been no evidence that this lowering of physical requirements has been responsible for increased illness or accident rates.

In accordance with instructions contained in Secretary of the Navy letter dated 25 October 1941 periodic physical examinations have been given to employees engaged in certain work hazardous to themselves or others. In addition to these periodic examinations, it has been considered advisable to perform periodic chest x-ray examinations on tool-grinders and on workers handling fibre glass. The use of this latter material has recently been introduced for insulating purposes, and since little is known of the effects of fibre glass dust upon the lungs, it seems desirable to keep a close watch of those employees who handle this material. In view of the increased scope of the periodic examinations, expansion of the facilities for performing these examinations has been necessary. The establishment of an industrial health office has been the first step to meet the increased requirements of the industrial program. It was felt that improved x-ray equipment suitable for taking chest x-ray films would facilitate and expedite performance of the required periodic examinations. Purchase of such equipment has been approved.

In July 1941, a Reserve officer with a wide experience in industrial health work was assigned to duty at the yard. Shortly thereafter, a medical officer from the Regular Navy who had undergone a course of training in industrial hygiene, was ordered to duty at the yard. After a short period of indoctrination, these two officers were designated as Industrial Health Officer and Assistant Industrial Health Officer, respectively.

A comprehensive industrial health program has been put into operation. The following activities have already been accomplished:

(a) Survey of lighting in several shops with recommendations for improvement.

(b) Study of the efficiency of spray painting booths, with recommendations.

(c) Study of ventilation in the temporary foundry, with recommendations.

(d) A study of illness (mercury poisoning) among painters working with antifouling plastic paint. As a result of this study, effective control measures have been put into effect.

(e) An investigation of nonstandard cleaning and degreasing agents used in the yard. As a result of the findings an order was issued prohibiting the use of unapproved cleaning agents in the yard.

(f) Compilation of a list of materials used in the yard which may offer potential health hazards. This list includes all solvents, such as benzol and carbon tetrachloride; all dust-producing materials, such as asbestos, sand, and fibre glass; and all toxic metals, such as lead and magnesium. Tabulations have been made showing which shops are using each substance and a paralleled analysis showing what materials are used in each shop. These tabulations are to be used as a basis for a comprehensive program of occupational disease prevention.

(g) A campaign of health education was instituted in an effort to reduce lost time due to nonindustrial illness among civilian employees. Posters illustrating the spread of respiratory infections have been placed on all bulletin boards in the yard. Plans have been formulated for distributing educational material on the subject of colds, tuberculosis, and nutrition.

(h) Preemployment chest x-ray survey. During the latter part of 1941, plans were completed for taking chest x-ray films on a sample of 1,000 consecutive male applicants for employment to ascertain whether any significant number of cases of active pulmonary tuberculosis will be found among men seeking employment at the yard.

(i) Space on the ground floor of Building No. 200, at the present time occupied by the safety engineer, has been allocated for use as industrial health office and laboratory.

*Norfolk Navy Yard, Portsmouth, Va.*—Although some attention has been directed to industrial hygiene at this yard for several years, it was not until the latter part of 1941 that a medical officer was assigned to this phase of medical department activities. The safety officer and the medical department have cooperated in an effort to detect hazards, and recommend measures to obviate them or make them less hazardous.

Preemployment physical examinations were conducted by the medical section of the Labor Board. An attempt is being made to conduct recheck examinations as recommended by the Navy Department, especially on those engaged in occupations involving hazardous exposures. Complete blood counts were obtained on [illegible]um handlers, basophilic aggregation tests on welders, cutter,

burners, and painters, and x-ray examinations of the chest are made on sandblasters.

The silica hazard in the foundry was reduced somewhat by the substitution of steel grit for sand in two modern blasting units. One old type sandblasting unit using sand is still in operation. Plans to replace this unit have been made and it is anticipated that this will be accomplished as soon as practicable. To minimize the hazard presented by sandblasting operations, approved personal protection equipment is provided.

There has been some time loss from metal fume fever, particularly among those working around welding and burning operations on new construction and repair jobs. In many cases the men are exposed unnecessarily to fumes due to reluctance on the part of leading men to take the time to secure and set up blowers in compartments where they are needed. It very frequently happens that attacks of metal fume fever develop among others working in the compartment than in welders or burners. Also cases develop among those working in a compartment when the bulkhead is being heated on the opposite side. This necessitates adequate ventilation in both compartments. An approved metal fume respirator that is so constructed that it can be worn under a welder's shield is being recommended for use by those exposed to metal fumes, and it is anticipated that the use of these respirators will reduce the time loss and increase production and efficiency.

There continues to occur an unnecessary number of cases of ophthalmia due to actinic rays from the welding arc. This is due to inexperience among many of the welders' helpers, carelessness on the part of those that may be working near welding operations, and failure of the welder in many instances to shield his work properly.

Goggles are provided for and generally used by those engaged in chipping and grinding. In spite of this an average of five foreign bodies in the eye occurs each day. These are most frequently due, however, to causes other than grinding and chipping. Occasionally a foreign body in the eye case is due to improperly fitting goggles as well as goggles worn on the forehead instead of over the eyes, and many of them happen while the worker is walking about in the yard to and from jobs and to and from work.

The campaign for the wearing of safety shoes has not been successful, and there continues to be an undue number of toe injuries, particularly among riggers.

*Puget Sound Navy Yard, Bremerton, Wash.*—A medical officer reported 11 August 1941 as the industrial medical officer for this navy yard. He is doing excellent work, and has offered many suggestions that have been instituted in aiding the health and hygiene of the industrial yard.

The list of technical equipment to establish an industrial health laboratory has been approved.

The industrial health officer is working in close cooperation with the injury officer and the leading-men of the various shops projects. Some very interesting and informative data ha[illegible]

been accumulated regarding injuries to yard employees and nonoccupational lost time.

The enlarged industrial health program was explained to the heads of the departments in the yard and to the masters of the various shops. The new program was received with enthusiasm and assured full cooperation. Many contacts with quartermen, leadingmen and individual workers have been established by the industrial medical officer during his frequent visits to the shops. A survey was made of all the shops and activities, and a chart prepared showing the location and nature of the possible health hazards.

Space for an industrial hygiene laboratory has been allotted in the chemical laboratory building and technical equipment has been requested. With the establishment of this laboratory, facilities will be available for investigation of industrial health hazards in this naval district.

A total of 2,276 eye injuries were treated at the dispensary during 1941 which indicates that the present eye protection is not satisfactory. The fact that eye injuries totaled 25.5 percent of all cases, but accounted for only 3.2 percent of the lost-time accidents indicates that there were few complications following the injuries.

The industrial medical officer has been working in cooperation with the safety engineer to determine the basic causes of the high frequency of certain types of injuries in the various trades. Meetings of supervisors in classes of 40 to 50 have been initiated. At these meetings emphasis is placed on the responsibility of the supervisors in guarding the safety and health of their men. Numerous problems and comments about procedures, policies, equipment and conditions were uncovered in the discussions following these meetings.

There were 10,401 sick leave applications during the year requesting a total of 46,451 sick days. Since a few employees do not have sufficient accumulated sick leave to cover their entire illness or injury, some take annual leave instead of sick leave, and some of the sick leave applications are not approved. 46,451 is not the total days absent from work due to nonoccupational illness. The following summary of a 3-year period is submitted for comparison:

| | 1939 | 1940 | 1941 |
|---|---|---|---|
| Number of sick leave applications | 2,768 | 6,174 | 10,401 |
| Number of sick days requested and approved | 16,997 | 28,594 | 46,451 |
| Average days requested per application | 6.25 | 4.63 | 4.46 |
| Average number of applications each month per 1,000 employees | 45.1 | 66.6 | 62.1 |
| Average number of sick days requested each month per 1,000 employees | 282 | 318 | 277 |

The lower average days of illness per case in 1940 and 1941 is apparently due to a great increase in one and two-day absences.

Both the frequency of applications and the nur[illegible]r of sick days requested show an expected seasonal variation